

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-10-2004

# Reinert v. Larkins

Precedential or Non-Precedential: Precedential

Docket No. 02-3184

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Reinert v. Larkins" (2004). *2004 Decisions.* Paper 374.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/374

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 02-3184
_____

SCOT A. REINERT,

*Appellant*

v.

DAVID H. LARKINS,
SUPERINTENDENT;
DISTRICT ATTORNEY OF LEHIGH
COUNTY,
JAMES MARTIN; *THE ATTORNEY
GENERAL OF
PENNSYLVANIA, GERALD
PAPPERT
*(Pursuant to Rule 43(c) F.R.A.P)

_____

On Appeal from the United States
District Court For
The Eastern District of Pennsylvania
(D.C. No. 98-cv-05257)
District Judge: Honorable Anita Brody

_____

Argued May 3, 2004

Before: SLOVITER, FUENTES and
BECKER, *Circuit Judges*

(Filed: August 10, 2004)

THEODORE SIMON, ESQ. (ARGUED)
Fifth Floor
1600 Market Street
Philadelphia, PA 19103

*Attorney for Appellant*

JAMES B. MARTIN, ESQ.
District Attorney of Lehigh County
JOAN L. REINSMITH, ESQ.
(ARGUED)
Deputy District Attorney
KELLY B. WALDRON, ESQ.
Office of District Attorney
455 West Hamilton Street
Lehigh County Courthouse
Allentown, PA 18101

*Attorneys for Appellees*

_____

OPINION OF THE COURT
_____

BECKER, *Circuit Judge*.

This appeal by Scot A. Reinert ("Reinert"), a state prisoner serving a sentence of life imprisonment for first degree murder, from an order of the District Court denying his petition for a writ of habeas corpus, presents two congeries of issues, one dealing with *Miranda* rights, and the other with ineffective assistance of counsel. Considering the *Miranda* issues first, we must evaluate the admissibility of three statements made by Reinert when he was being transported to the hospital by

emergency medical technicians ("EMTs"), accompanied by police officers. The admissibility of the first two statements— one to an EMT and the other to an officer, both of which were given prior to the administration of any *Miranda* warnings—turns on whether Reinert was in custody at the time he made the statements. The admissibility of the third statement, made to a police officer after a *Miranda* warning had been given, depends on Reinert's competence at the time to waive his *Miranda* rights. Then we must determine whether Reinert was competent to waive his *Miranda* rights when he made a statement to two detectives at the hospital following surgery. We do not, of course, either write or decide on a blank slate. The record contains fact findings by the state trial judge following a suppression hearing, and our decision making is constrained by the rigorous standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in relevant part at 28 U.S.C. §§ 2241-2255.

We are satisfied that, at the time of Reinert's first statement, made to an EMT when he was being transported to the hospital for treatment (at which time he was not a crime suspect and indeed was considered a possible victim), he was not in custody, even though a police officer was present in the ambulance. However, with respect to the second statement made in the ambulance to a police officer to whom Reinert was "turned over" by the EMT after his first seemingly incriminating statement, we conclude that

Reinert was in custody and that his pre-*Miranda* statement should not have been admitted. Deference is not due to the state trial judge's finding and conclusion to the contrary because she mistakenly stated that the second statement was post-*Miranda* warning. However, due to the fact that the statement was duplicative of others properly received after appropriate *Miranda* warnings were administered, we conclude that the error was harmless.

Additionally, we are satisfied that when the post-*Miranda* statement in the ambulance and the subsequent (post-surgery) statement was made at the hospital, Reinert was alert and oriented and that his waiver of *Miranda* rights was voluntary. The state trial court decision, in accord with these conclusions, was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, nor was it contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The second set of issues before us stems from Reinert's claims of ineffective assistance of counsel allegedly in violation of his Sixth Amendment rights. First, he complains of his state trial counsel's failure to call a medical expert to testify at the suppression hearing as to his alleged mental and physical inability to voluntarily and knowingly waive his *Miranda* rights. However, our analysis of the record will show that the expert testimony that Reinert believed would have helped him would have made no difference to the merits of

his *Miranda* claim. He also scores his counsel's failure to inform him of his right to testify at the suppression hearing, but we conclude that this claim too lacks merit. Reinert has thus failed to demonstrate that he was prejudiced by his counsel's actions; moreover the state court's conclusions on the issue were not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

We will therefore affirm the order of the District Court denying the petition.

## I. Background Facts

On March 10, 1991, responding to a telephone call during which Reinert made some rather bizarre statements, his mother Janet Ketner and her husband rushed to his home and found him sitting on the first floor covered in blood, with large, visible slashes on both wrists. Mr. Ketner called 911, describing Reinert as delirious. Police and ambulance services soon arrived. Reinert looked strange, and it was determined that he had recently attempted suicide by drinking alcohol, taking sleeping pills, and slashing his wrists. At 12:11 p.m., Officer Jeffrey Mertz ("Mertz") arrived, checked on Reinert and his parents in the first floor living room, and then went upstairs to check the parents' report of a body on the third floor. When Mertz reached the third floor, he found the body of Sean Brady, Reinert's long time companion, and determined that he was dead.

Shortly after Mertz's arrival, three more Allentown police officers, Bruce Zimmerman ("Zimmerman"), Robert Lembach ("Lembach"), and Brian Brader ("Brader"), arrived at Reinert's home, followed by the EMTs. Law enforcement officers secured the home. The EMTs examined Reinert; his blood pressure was down and his pulse rate was up. The EMTs helped Reinert to his feet and he then walked to the ambulance. At this juncture, Zimmerman was ordered by his superiors to remain with Reinert and told "not to let him leave your custody."

Reinert was laid on a stretcher inside the ambulance, had an oxygen mask placed over his face, was given IVs in his arms, and was hooked up to an electrocardiograph. Reinert had been observed to have lacerations to his wrists and he complained of an injured ankle. When he was in the ambulance, the EMTs noticed multiple lacerations to his abdomen. Upon discovery of the abdominal wound, EMT Timothy Snyder ("Snyder") asked Reinert "what happened?" Reinert responded "I stabbed him with a butcher knife, then I did myself." Snyder at once turned to Officer Zimmerman and stated, "I think you ought to step in."

Zimmerman then, without advising Reinert of his *Miranda* rights, asked him "what happened?" Reinert responded to the question by stating, "I think I killed him. I think I stabbed him." At that point, Zimmerman read Reinert his *Miranda* rights. *See infra* note 3. After reading Reinert his rights, Zimmerman asked him:

"And with these rights in mind, do you wish to talk to us now?" Reinert replied: "I think I killed him." When asked whom he had killed, Reinert responded: "Sean, Sean Brady," "with a butcher knife."

Once at the Lehigh Valley Medical Center ("LVMC"), Reinert underwent preparatory treatment for surgery by Nurses Thomas Gavigan and Patricia Lombardo. Police officers were ordered by their superiors to stand guard outside his room.[1] Reinert entered surgery at approximately 1:15 p.m. Prior to surgery, Reinert was, of course, anesthetized. Surgery lasted approximately two and one-half hours. Reinert lost about half a pint of blood during the operation; he had also lost a quart of blood prior to being treated by the EMTs. Reinert experienced post-operative pain, and was given Robinal, a sedative and muscle relaxant, at 3:30 p.m, and Cefoxitan, an antibiotic, at 6:00 p.m.

---

[1]Zimmerman asked Gavigan prior to Reinert's treatment, at the doors of the trauma room, "to note down anything that Reinert said which may be of use to him." During this surgical preparation, Gavigan asked Reinert some questions, to which Reinert responded that he had been fighting with his friend with a knife, they had fallen off the bed and that he, the friend, might have done this. Reinert also acknowledged he might have wounded himself, and that he had fallen down the stairs. However, Reinert's response to the nurse is not at issue on appeal.

At 7:47 p.m., Detectives Joseph Stauffer ("Stauffer") and Glenn Granitz ("Granitz") arrived at the hospital. The detectives first spoke to the attending physician, Dr. Homayoun Hashemi ("Dr. Hashemi"), who testified that he performed a post-operative check at 7:30 p.m. on Reinert, and found him awake, coherent, and with stable vital signs. After conferring with Dr. Hashemi, the detectives went to see Reinert. They testified that they found him conscious, oriented, alert, and responsive. They proceeded to interview him while he was laying in the recovery room, wrists and abdomen bandaged, attached to IVs and other post-operative equipment. They first read him his *Miranda* rights. The two detectives present differing accounts as to how Reinert responded to the question: "Do you waive these [*Miranda*] rights?" Stauffer stated that Reinert answered the question verbally with a "yes," whereas Granitz said that Reinert merely nodded his head. Both detectives, however, agreed that Reinert clearly communicated to them his decision to waive his *Miranda* rights.

The detectives then questioned him for forty-five minutes, during which Reinert stated that he had obtained a knife, had gone to see Sean Brady, who was in bed, and stabbed him. Reinert's chart indicated no abnormality with regard to his ability to answer questions appropriately. Dr. Hashemi also testified that the first administration of medication for pain, specifically morphine, was not administered to the defendant until 10:00

4

p.m. We will amplify this factual background in our discussion of the procedural history and the merits issues, *infra*.

## II. Procedural History

On or about March 10, 1991, Reinert was arrested and charged with the criminal homicide of Sean Brady. Pre-trial motions, including motions to suppress physical evidence and statements, were heard before Judge Carol K. McGinley of the Court of Common Pleas of Lehigh County. After a hearing, the suppression motions were denied.

The suppression court made a number of relevant findings. First, it rejected Reinert's claim that his pre-*Miranda* statement should be dismissed, finding that the statement was "volunteered by the defendant to Paramedic Snyder . . . in response to a routine question by paramedic Snyder." The court further concluded that:

> . . . although the police were present, there is nothing in the situation which would lead a reasonable man to believe that he was under arrest or in the custody of the police. The arrival of the police at the scene was due to a request made on his behalf by his mother and her husband, and the defendant's transport to the Hospital Center was voluntary on his part. The mere fact that police were present was not in any way

indicative that the defendant was in their custody. Their presence would be explained by many things, including a desire to interview an important witness or a desire to protect a potential victim.

We conclude therefore that the statement made to paramedic Snyder was not made while the defendant was in custody and, furthermore, that it was not made pursuant to interrogation by police officers.

Second, the suppression court concluded that:

> The defendant remained conscious, alert and oriented throughout his transport to the hospital. No medication was administered to him in the care of the Emergency Medical Service Unit.

Then, after describing his treatment in the emergency room, the Court found that Reinert

> . . . remained alert and coherent. He responded to questions concerning allergies to medication and to the approximate time of his most recent tetanus inoculation. He indicated he was allergic to penicillin. Ms. Lombardo observed that his blood pressure was stable, that his pulse was providing him with adequate oxygenation to the brain, and she performed the Glasgow coma score to determine

his level of consciousness. In all categories the defendant received the highest possible score.

Turning to the next phase of the treatment, the surgery, from which Reinert returned at approximately 4:05 p.m., the suppression court found:

At 7:47 p.m. Detective Stauffer arrived at the hospital with Detective Granitz. After speaking to the attending physician, Dr. Homayoun Hashemi, the detectives proceeded to interview the patient. The questioning began at least five hours after the defendant's surgery had been completed.

Detective Stauffer determined that the patient was conscious and oriented. He asked him his date of birth and his social security number, both of which were later verified as accurate. He asked him other questions to determine whether or not the defendant was aware of his surroundings and received satisfactory answers.

After determining that the defendant was able to be responsive, Detective Stauffer advised him of his rights, following which the defendant said he understood his rights and he agreed to speak with the police. Detective Granitz also asked questions to determine the capacity of the defendant, both at the beginning and the end of the statement.

The defendant, upon questioning by Detective Stauffer, made incriminating statements. In the course of making these statements the defendant was voluble, and volunteered information not specifically sought by Detective Stauffer. The questioning ended at 8:30 p.m.

Dr. Hashemi testified that he had performed a post-operative check at 7:30 p.m. on the defendant, that he had seen that the defendant was awake, coherent, and had stable vital signs. His chart indicated no abnormality with regard to the defendant's ability to answer questions appropriately. Dr. Hashemi also testified that the first administration of medication for pain, specifically morphine, was not administered to the defendant until 10:00 p.m.

Immediately following his statements to the police, the defendant was seen by his family, his close friend Cindy Mellinger, and his mother's minister. All testified that he was extremely soft-spoken at this time.

A jury trial commenced on January 15, 1992, resulting in a verdict of guilty of murder in the first degree. Reinert was sentenced to life imprisonment. Timely post-trial motions were denied as to all issues on November 15, 1994.

Through new (and present) counsel, Reinert appealed to the Pennsylvania

Superior Court. During that appeal Reinert raised the issue of the effectiveness of his trial counsel, submitting a number of affidavits/letters in support of his ineffectiveness claim. On January 23, 1996, the Superior Court denied relief on all grounds in a Memorandum Opinion, denying the ineffectiveness claims without ordering an evidentiary hearing. *Inter alia*, the Superior Court stated:

> After reviewing the record, we find that trial counsel thoroughly cross-examined all of the Commonwealth's witnesses regarding Reinert's mental and physical state at the time he was given *Miranda* warnings and when he made statements to both the police and the medical staff. Moreover, we note that the Commonwealth produced overwhelming evidence that Reinert had knowingly and voluntarily waived his *Miranda* rights. Thus, we conclude that trial counsel was not ineffective for failing to call medical experts at the suppression hearing. *See* [*Commonwealth v. Williams*, 640 A.2d 1251 (Pa. 1994)] (counsel was not ineffective for failing to call expert witnesses where he extensively cross-examined police officer and doctor regarding their testimony); *see also Commonwealth v. Logan*, 549 A.2d 531 (Pa. 1988) (counsel was not ineffective for failing to employ

psychiatric testimony at suppression hearing to demonstrate that defendant's mental illness prevented proper waiver of *Miranda* rights where evidence indicated defendant was aware of nature of right and consequence of waiver).

The Superior Court also rejected Reinert's contention that he was denied effective assistance of counsel because his attorneys failed to advise him that he could testify at the suppression hearing. The Court found that he established neither what his testimony would have been, nor how it would have altered the outcome of the hearing. There was never an evidentiary hearing on the ineffectiveness issue, which was raised for the first time in the Pennsylvania Superior Court; the Superior Court rejected that claim on the basis of the record before it.

A motion for reconsideration and/or reargument was denied by the Court. A petition for allowance of appeal and a petition for reconsideration of denial of petition for allowance of appeal were filed and denied by the Pennsylvania Supreme Court on September 26, 1996, and December 11, 1996, respectively. A petition for a writ of certiorari was denied by the United States Supreme Court on October 6, 1997. This petition for a writ of habeas corpus now before us was filed on October 2, 1998, and was denied by the District Court on July 8, 2002. A motions panel of this Court granted a certificate of appealability ("COA"). Reinert continues to serve a sentence of life imprisonment

7

for murder. Because Reinert's claims were fully adjudicated in state court, we apply the by now familiar AEDPA standard of review, which we set forth in the margin.[2]

## III. Admissibility of Reinert's Statements

### A. Pre-*Miranda* Statements to EMT Snyder and Officer Zimmerman

As we have set forth above, at the time

---

[2]Although our review of the District Court's decision is plenary, *Marshall v. Hendricks*, 307 F.3d 36, 50 (3d Cir. 2002), under AEDPA and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000), we must deny federal habeas corpus relief to any claim which was adjudicated on the merits in a state court proceeding unless such adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d)(1) and (2). A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases . . . . [or] if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams*, 529 U.S. at 405-06. A state court decision involves "an unreasonable application of" clearly established federal law if it "unreasonably applies the law of this Court to the facts of a prisoner's case." *Id*. at 409. This is an objective test: "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. Moreover, "unreasonable" does not mean "erroneous." Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

This standard does not apply, however, to claims that the state courts did not address on the merits. In such instances we exercise the pre-AEDPA standard and "conduct a de novo review over pure legal questions and mixed questions of law and fact. . . . However, the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1)." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

of his initial statement Reinert was in the ambulance being tended by the EMTs. After asking questions about his past medical history and allergies to medications, EMT Snyder, in an effort to find out how the injury to the abdomen was sustained, asked Reinert what happened, receiving the response "I stabbed him with a butcher knife, then I did myself." At this point, Snyder notified Officer Zimmerman and went on with his treatment. When asked whether he was paying attention to the conversation taking place between Officer Zimmerman and Reinert, Snyder responded: "No, my job is to administer emergency care, and my patient is my priority."

After Snyder asked Zimmerman to step in, Zimmerman, without advising Reinert of his *Miranda* rights, asked him "what happened?" and Reinert responded to the question by stating: "I think I killed him. I think I stabbed him." At that point, Zimmerman read Reinert his *Miranda* rights. More specifically, Zimmerman read to Reinert the standard *Miranda* Card, the text of which we set forth in the margin.[3] At trial, Zimmerman testified

that the following colloquy ensued.

Q. Did Mr. Reinert respond to this first question, "did he understand his right?"

A. As best as he could, yeah, he – they were working on him and he, you know, he kind of nodded and then he said yes, or yeah.

Q. Did he actually vocalize words?

A. Right, yeah.

Q. He said, "yeah", correct?

A. Correct

Q. And you then asked him a second question, and what did he respond then?

A. He basically just said, "I think I killed him" He didn't say yes, and then go on – he just started talking.

Q. And what else did he say, or did you ask any further questions?

A. Yeah, I said, again, going back to that first thing, "I think I killed him, I stabbed him." I said "Who did you kill?" And he said, "Sean." And I asked, "Sean Brady?"

---

[3]"My name is Officer Bruce Zimmerman of the Allentown Police Department. I wish to advise you that you have an absolute right to remain silent. That anything you say can and will be used against you in a Court of law. That you have the right to talk to an attorney before and have an attorney present with you during questioning. That if you cannot afford to hire an attorney one will be appointed to represent you, without charge, before any questioning, if you so desire. And if you decide to answer any questions you may stop at any time you wish. Do you understand these rights I've explained to you? And with these rights in mind, do you wish to talk to us now?"

and—or he said, "Sean Brady," I said, "Is that the gentlemen upstairs on the third floor?" He said, "Yes." I said, "How did you do it?" He said, "With a butcher knife."

Reinert argues at great length that he was in custody at the time of the ambulance statements. His principal contentions are the following: (1) The police had entered his home and controlled it (though they had entered at his mother and stepfather's request); (2) the investigating officers were directed to accompany Reinert in the ambulance and keep him in their custody; and (3) the officers were in close proximity to Reinert in the ambulance. Reinert contends that these factors combined in such a way that a reasonable man in his situation would not think himself "free to leave."

It is not entirely clear from Reinert's brief whether he objects to the statement made to the EMT or only to the one made to Zimmerman, but we will assume that objection is made to both.

### 1. The pre-*Miranda* statement to EMT Snyder

The state trial judge found as follows:

The first statement is that statement volunteered by the defendant to paramedic Snyder. At the time the statement was made, it was volunteered by the defendant in response to a routine question by paramedic Snyder. It was not solicited by the police.

Furthermore, although the police were present, there is nothing in the situation which would lead a reasonable man to believe that he was under arrest or in the custody of the police. The arrival of the police at the scene was due to a request made on his behalf by his mother and her husband, and the defendant's transport to the Hospital Center was voluntary on his part. The mere fact that police were present was not in any way indicative that the defendant was in their custody. Their presence could be explained by many things, including a desire to interview an important witness or a desire to protect a potential victim.

We conclude, therefore, that the statement made to paramedic Snyder was not made while the defendant was in custody, and, furthermore, that it was not made pursuant to interrogation by police officers.

The question, of course, is whether the state court's determination that Reinert was not in custody is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. We do not believe that this standard is met by Reinert with respect to

10

the statement made to the EMTs. Reinert was not in custody, nor was he a suspect in a crime when he entered the ambulance for the purpose of medical treatment and transport to the hospital. Although police officers accompanied Reinert in the ambulance, at that time officers had the limited knowledge that a body was found inside the house and that Reinert appeared to be wounded. Officers could have reasonably assumed that Reinert was a victim who could possibly identify a third person that may have been in the house. Snyder stated that police officers regularly ride with him in the ambulance and that he requested police officers to accompany him on this occasion.

Ordinarily, in determining whether an individual is in custody, the ultimate inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). When the individual has not been openly arrested when the statements are made, "'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'" *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974) (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969)).

Reinert argues that the interrogation in the ambulance was custodial because he was never told that he was free to leave or free not to answer questions. He contrasts his situation with the one at issue in *United States v. Leese*, 176 F.3d 740 (3d Cir. 1999), where a postal employee suspected of having stolen postal funds was found not to be in custody during the course of an interrogation where she was told she was not under arrest, that she would not be made to go with her questioners when they left, and during the course of which she was allowed to take breaks in order to consult with her union representative. Reinert argues that unlike in *Leese* where the suspect was given ample opportunity to end questioning and where she was explicitly told that she was not under arrest, Reinert was never afforded similar information or opportunities.

While the difference is real, it is not dispositive. Had Zimmerman made an explicit statement to Reinert that he was not under arrest or that he need not answer questions, such a statement would surely have bolstered the government's contention that Snyder's questioning was non-custodial in nature. However, the absence of such a statement does not *ipso facto* turn questioning into a custodial interrogation, especially when the questioning is being done by a medical professional in the course of providing routine medical care. *See Mathiason*, 429 U.S. at 495 ("[P]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect.") Given that Reinert was in the ambulance

receiving care for an open wound and had an oxygen mask covering his face, it seems unlikely that he could or would have left the EMTs' care, even if Zimmerman had told him that he was at liberty to do so. Under those circumstances, an explanation that he was not required to answer questions would have no doubt been more meaningful and more appropriate. However, as we explained above, such a statement, while helpful to determine the custodial nature of the interrogation, is not required to render an interrogation non-custodial.

More to the point, although Officer Zimmerman was present under the described circumstances, the case of ambulance transportation is oblique to the core of "in custody" jurisprudence where the focus is on the relationship between the officers and the suspect in terms of putative coercion and freedom to leave. In our view, the presence of Zimmerman in the ambulance was a background factor in terms of Reinert's statement to Snyder. Reinert had entered the ambulance voluntarily and was in the charge of the EMTs who elicited the challenged statement innocently (they did not know Reinert to be a criminal suspect) in the course of obtaining routine medical information. Under these circumstances, and others recited above, we do not think that the state trial judge's determination was based on an unreasonable determination of the facts in light of the evidence. Nor was the legal conclusion based thereon contrary to or an unreasonable application of federal law as

determined by the Supreme Court. Accordingly we will affirm the order of the District Court on that issue.

## 2. The pre-*Miranda* statement to Officer Zimmerman

The statement made to Officer Zimmerman in response to his "what happened" question ("I think I killed him, I stabbed him.") is another matter. At that point Reinert had made an incriminating statement, and when the EMT turned him over to Officer Zimmerman, he had to know that he was a suspect being questioned by a police officer. Prior to starting his question, Zimmerman should have, but failed to, read Reinert his *Miranda* rights. The state trial judge's treatment of this matter was premised on a misapprehension or misstatement of the facts—that Reinert had been Mirandized already when, in fact, he had not: "The next statement made by the defendant was a statement given to Officer Zimmerman in the ambulance. Prior to this statement, Officer Zimmerman advised the defendant of his *Miranda* rights, following which the defendant indicated that he wished to answer questions." The Commonwealth now concedes that the judge was mistaken in stating that Reinert was given *Miranda* warnings before the statement to Zimmerman. We must therefore reject the state court's finding with respect to the first ambulance statement to Zimmerman.

However, "[w]here a subsequent confession is obtained constitutionally, the admission of prior inadmissible confessions [is] harmless error." *United States v. DeSumma*, 272 F.3d 176, 180 (3d

12

Cir. 2001) (quoting *United States v. Johnson*, 816 F.2d 918, 923 (3d Cir. 1987)) (first alteration in original). Because we conclude that Reinert made subsequent, constitutionally obtained, admissible statements that mirrored his earlier un-Mirandized statement, *see infra* Parts III.B and III.C, we hold that admission of the initial statement was harmless error, even under the stringent constitutional error standard where we may affirm only if the error is harmless beyond a reasonable doubt. *See United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

## B. The Post-*Miranda* Statement to Officer Zimmerman

At this point, Zimmerman read Reinert his *Miranda* rights. The issues presented by Reinert are twofold. He contends (1) that he was not physically and mentally capable of knowingly, intelligently, and voluntarily waiving his *Miranda* rights and (2) that even if he were, the post-*Miranda* statement was not validly obtained in light of his pre-*Miranda* confession.

### 1. Competence and waiver

The Supreme Court has frequently articulated the applicable waiver standard. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court held as to waiver and burden:

> The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and

intelligently.

\* \* \*

> If the interrogation continues without the presence of an attorney and a statement is taken, *a heavy burden rests on the government* to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U.S. 478, 490, n.14 [(1964)]. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458 (1938), and we reassert these standards as applied to in-custody interrogation.

*Id*. at 444, 475 (emphasis added).

The Court made clear in *Moran v. Burbine*, 475 U.S. 412, (1986), the two-pronged test for waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite

13

level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. at 421 (internal quotations marks and citations omitted).

We have also explained that:

> This inquiry requires us to consider the totality of the circumstances surrounding the interrogation, which includes examining the events that occurred and the background, experience, and conduct of the defendant. *Miranda* rights will be deemed waived only where the totality of the circumstances "reveal[s] both an uncoerced choice and the requisite level of comprehension."

*United States v. Sriyuth*, 98 F.3d 739, 749 (3d Cir. 1996) (quoting *Moran*, 475 U.S. at 421) (citations omitted).

The state trial judge concluded, after the suppression hearing, that Reinert's mental and physical states were such that he was "conscious, alert and oriented on three spheres." She added that:

> [T]he interview by Officer Zimmerman was brief, the interrogation routine, and the detention basically the result of circumstances created by the defendant. Clearly there was no physical threat to the defendant from the police inasmuch as the interview took place in the ambulance in the presence of paramedics. We firmly conclude

that there was no physical or psychological coercion in the situation, nor in the questioning technique used by Officer Zimmerman.

This finding is clearly supported in the record. EMT Snyder testified at the suppression hearing that Reinert remained "conscious, alert, and oriented throughout our transport" and that he was "very much aware and awake, and knew what was going on. I explained every part of the treatment that I was doing for him, and he understood that fully." When asked, "And this was during the entire time when Officer Zimmerman was talking to Mr. Reinert as well?", Snyder responded, "That's correct." In sum, Snyder stated that Reinert answered all questions posed to him "intelligently." Officer Zimmerman testified that Reinert was "lucid and coherent." And Officer Lembach, who was also in the ambulance, testified that Reinert was alert and coherent, and that his answers to questions asked in the ambulance were responsive and pertinent and did not go off on tangents.

As noted above, Reinert had walked to the ambulance. The record of treatment administered to him in the ambulance was unexceptional. Reinert was wearing an oxygen mask but that did not impair communication. He was receiving IV fluids and was connected to an electrocardiograph. His vital signs were monitored. But none of this impaired his coherence. Supporting this conclusion is the testimony of Nurse Patricia Lombardo

14

of LVMC who, shortly after Reinert's admission, observed him and administered the Glasgow coma test, about which she discoursed at some length. The short of it is that Reinert received the highest (Glasgow) score for verbal and motor response, and for being alert and oriented. His respiratory rate, vital signs, etc., were all good. Independently, Nurse Lombardo concluded that Reinert was alert.

In opposition to this welter of testimony the state trial judge had only the testimony of Reinert's mother and stepfather, which it had the clear right *not* to credit, and did not credit. In this appeal, Reinert relies largely on the affidavits of two psychiatrists whose affidavits were offered at the Pennsylvania Superior Court level as appendices to his direct appeal brief. The Superior Court declined to consider these affidavits and none of them were before the trial court. They were also attached to his federal habeas petition. These psychiatrists, Dr. Lynn Bornfriend ("Dr. Bornfriend") and Dr. Robert Sadoff ("Dr. Sadoff"), did not examine or witness Reinert during the time period in which he was in the hospital or in the ambulance, and relied solely upon the narratives of Reinert's family and friends and excerpts from the (subsequent) medical records of LVMC.

The Commonwealth submits that we cannot consider these affidavits which were not a matter of record and which are presented to the Court merely as attachments to a pleading, citing *United States v. Madkins*, 994 F.2d 540, 542-43 (8th Cir. 1993) (citing *United States v.*

*Drefke*, 707 F.2d 978, 983 (8th Cir. 1983) (holding efforts to supplement record by affidavits or attachments to brief improper)). Reinert counters with the argument that consideration of these affidavits is necessary to demonstrate the ineffectiveness of his trial counsel in not presenting expert evidence at the suppression hearing. This "counter" seems inadequate because the affidavits are being presented in support of two different contentions: a merits issue involving *Miranda* rights and a collateral issue involving the ineffective assistance of counsel. Given that these affidavits were not part of the record before the trial court, Reinert most likely procedurally defaulted this line of argument on his *Miranda* claims, and should be allowed only to use the affidavits insofar as his claim for ineffectiveness is concerned. However, since the affidavits relate both to the *Miranda* and ineffectiveness issues, and since we will need to examine the affidavits when we reach the ineffectiveness claims, we will, out of an abundance of caution, consider the substance of the Sadoff and Bornfriend affidavits—both of which conclude that Reinert was not competent physically or mentally to waive *Miranda* rights or to make statements either in the ambulance or post-operatively at the hospital—in terms of the *Miranda* claims as well.

Dr. Bornfriend relies on a number of factors: (1) several nursing entries describing Reinert as confused after his admission to LVMC; (2) lab evidence of dehydration, blood loss, liver damage and

15

an extruding wound (the occasion for the subsequent surgery); and (3) an increased white blood cell count. Dr. Bornfriend opines that Reinert was in emotional shock, largely as the result of having been in the house with a corpse for two days. She also makes reference to his recent suicide attempt. Dr. Sadoff relies on: (1) Reinert's mother's description of his confusion; (2) the emotional shock of the altercation with Sean Brady; and (3) Reinert's low blood pressure and fast heart rate. We find this counter underwhelming, surely not enough to render the state trial judge's supported findings unreasonable or to undermine her conclusions of law under the AEDPA standard as to the validity of the waiver and the post-*Miranda* statement in the ambulance.

## 2. Validity of post-*Miranda* statement

Reinert argues that, even had he been competent to waive his Miranda rights in the ambulance, the post-*Miranda* statement would nevertheless be invalid because it followed too quickly on the heels of a non-Mirandized confession. To support his contention, Reinert attempts, unsuccessfully, to distinguish his case from *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, a man suspected of burglary made an incriminating statement in his own home without having been Mirandized. He was taken to the police station, and after he was advised of and waived his *Miranda* rights, the suspect produced a written confession. In his subsequent prosecution for burglary, the state trial court excluded from evidence his first statement because he had not been

given *Miranda* warnings, but admitted the written confession. Elstad was convicted, but the Oregon Court of Appeals reversed, holding that the confession should also have been excluded because of the brief period separating his initial, unconstitutionally obtained statement and his subsequent confession. In reversing the Oregon Court of Appeals, the United States Supreme Court explained that the failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. *See Elstad*, 470 U.S. at 304-11.

The Court held that it was "an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id*. at 309. The Court further held that although *Miranda* "requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id*. Absent deliberate coercion or improper tactics in obtaining an unwarned statement, a careful and thorough administration of *Miranda* warnings cures

the condition that rendered the unwarned statement inadmissible. *See id.* at 311-12.

Reinert argues that no cure could be made in his case because the police created coercive circumstances and that other independent circumstances, such as the injury and resulting pain, tainted the investigatory process beyond repair. We disagree. The Supreme Court's most recent pronouncement on this issue supports our conclusion. In *Missouri v. Seibert*, 124 S. Ct. 2601 (2004), a suspect was questioned for 30 to 40 minutes and confessed to her role in the crime of second-degree murder. She was given a 20-minute break and was only then Mirandized. After receiving her *Miranda* warnings, she signed a waiver and the questioning resumed. During the post-*Miranda* questioning, she was confronted with her prewarning statements, and was made to repeat the information she had given before she was Mirandized. In holding unconstitutional the interrogation technique of intentionally withholding *Miranda* rights to obtain a confession and of subsequently reading the *Miranda* rights and continuing on with the interrogation, the Supreme Court distinguished *Seibert* from *Elstad* in the following way:

> *Elstad* rejected the "cat out of the bag" theory that any short, earlier admission, obtained in arguably innocent neglect of *Miranda*, determined the character of the later, warned confession, *Elstad*, 470 U.S. at 311-14; on the facts of that case, the Court thought any causal connection between the first

and second responses to the police was "speculative and attenuated," *id*. at 313. Although the *Elstad* Court expressed no explicit conclusion about either officer's state of mind, it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally. *See Elstad*, [470 U.S.] at 309 (characterizing the officers' omission of *Miranda* warnings as "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will").

*Id*. at 2612.

We are confident that Reinert's case more closely resembles Elstad's than Siebert's. Zimmerman's initial failure to read Reinert his *Miranda* rights, though unfortunate and unexplained, seems much more likely to have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot. While it would have been preferable for Zimmerman to read Reinert his rights immediately before eliciting the initial response, we conclude that the cure mandated by *Elstad* was met in this case and that, because Reinert's waiver was knowing and voluntary, the post-*Miranda* statement was properly

entered into evidence.

## C. The Statement at the Hospital

Probably the most incriminating statement made by Reinert was that made to Detectives Stauffer and Granitz after surgery at LVMC. In that statement Reinert admitted that he had obtained a knife and then went to see Brady, who was in bed, and stabbed him. We have already recounted the essential history of the events after Reinert's admission to the hospital, *see supra* Part I. We have amplified that description through recitation of the state trial judge's findings, *see supra* Part II; we will not rescribe that material here. However, our review of the record confirms that all the facts stated by Judge McGinley are supported by the record.

As our frame of reference, we reiterate that surgery (on March 10, 1991) lasted from 1:15 p.m. to 3:45 p.m., and the interrogation took place at about 8:00 p.m. It was discovered during surgery that one of the knife wounds in Reinert's abdomen had also cut his liver. The surgery consisted of an exploratory laparotomy to examine stab wounds to the abdomen. The results were essentially negative, except for a non-bleeding laceration of the left lobe of the liver and a large retroperitoneal hematoma. There was no evidence of injury to any intraabdominal organ. Because the retroperitoneal hematoma was stable, nothing was done, and the abdomen was closed after copious irrigation. Reinert's wrist lacerations were then repaired, and he was taken to the Shock Trauma Unit for observation.

We have scrutinized the entire LVMC record. That record is consistent with the facts chronicled above, most importantly that at times relevant Reinert was alert and oriented. Initially, the surgeon, Dr. Barry Slavin, reported that Reinert woke up promptly and was awake and alert after recovery from anesthesia. Morphine for pain was not administered until 10:00 p.m., well after the statement at issue had been made. Reinert was also given Robinal, a sedative and muscle relaxant, at 3:30 p.m. and Cefoxitan, an antibiotic, at 6:30 p.m. The most important witness, however, was Dr. Hashemi, the chief surgical resident, who had come to LVMC afer three years of surgical residence at Presbyterian and the University of Pennsylvania Medical Center. As noted above, Dr. Hashemi testified that he had performed a post-operative check at 7:30 p.m. on the defendant, and that he had seen that Reinert was awake, coherent, and had stable vital signs. His chart indicated no abnormality with regard to Reinert's ability to answer questions appropriately. This testimony accords with that of the detectives who questioned Reinert after his surgery and said that they found him conscious, oriented, alert, and responsive.

Arrayed against this solid phalanx of evidence is the testimony of Reinert's mother, stepfather, a friend Cindy Mellinger, and Reinert's mother's pastor, Ronald Keller, who saw Reinert after the police left. They all described him as extremely quiet and soft spoken, kind of "mumbly," heavily sedated. Reinert also contends that he was affected by the pre-surgical medicine, especially the

18

anesthesia, and by the Robinal given at 3:30 p.m. Additionally, Reinert relies heavily on appeal on a psychiatric consult the day after surgery.

Dr. Joseph Antonowicz, a psychiatrist, reported that:

The patient tells me that he remembers essentially nothing of the events that led to his hospitalization here. He tells me that the police have informed him that they suspect him of having murdered Shawn. He is quite surprised by this. The patient is very tearful at the loss of Shawn and seems to genuinely miss him. He states that he currently does have suicidal ideation, although he does not have a plan at this time.

The patient is an alert, cooperative young man who appears quite sad. He also appears very befuddled and shows some disorganization in his thought process. He tends to be somewhat rambling and at times is mildly loosened in his associations. He seems quite bewildered by what's going on as well as frightened. There are no hallucinations. There do not appear to be delusions present at this time. However, the patient is somewhat guarded in his history. Affect is depressed. Sensorium: He is oriented times three. Memory: 2 of 3 objects at 5 minutes. Similes: Good. Proverbs: Quite concrete. Insight: Limited. Judgment: Good on formal testing.

IMPRESSIONS: The patient is a 27 year old white male admitted to the Lehigh Valley Hospital Center on 03/10/91 followed self inflicted stab wounds with slashed wrists. He is currently under arrest on suspicion of having murdered his roommate. The patient has essentially no recollection of events leading to and including these alleged occurrences. At the present time he is confused, overwhelmed, frightened and seemed somewhat disorganized in his thought processes.

Working diagnoses are:

1. Psychogenic amnesia versus malingering.

2. Possible reactive psychosis. I am uncertain about the presence of psychosis in this case, although he does seem inordinately bewildered and disorganized.

These pieces of evidence are used by Drs. Bornfriend and Sadoff in their affidavits. Dr. Bornfriend writes:

Reinert was in the Operating Room for laparotomy and tendon repair until around 4:00 in the afternoon. During surgery, he was given many anesthetics, including Fentanyl, a synthetic narcotic, and Robinal, a sedative and muscle relaxant. Without the above medications, any patient would be in severe pain after such extensive surgery. It was, therefore, clear that the narcotic and sedative and muscle

19

relaxant effects of these medications persisted and remained during the course of Mr. Reinert's being interviewed by the police and that when these medications wore off, Mr. Reinert was in severe pain and required 4 mgs. of morphine. In addition, the fact that a physician told police officers that Mr. Reinert's health would not be threatened by their questioning him does not imply that he was cognitively and mentally clear enough for them to do so.

Dr. Sadoff recapitulates the traumatic events preceding the stabbing, the impressions of Dr. Antonowicz, the reports of the family members who saw Reinert after the surgery, and the LVMC records. He concludes:

One is usually in a fairly confused state of mind following surgery with general anesthesia, and is not thinking as clearly usually, as one does after several days. Scot had just been through a serious altercation with his lover, had lost his lover by death and had been in a state of shock himself following loss of large quantities of blood due to self-inflicted and other wounds to his wrists and his abdomen. He appeared confused to his mother on the telephone and also when she visited him at his residence shortly thereafter. He also appeared less than clear to his mother, stepfather, pastor and female friend while in the hospital following surgery.

Thus, for all the reasons noted above, it is my opinion, within reasonable medical and psychiatric certainty, that at the time of the taking of the statement of Scot Reinert, he was not at his clearest thinking and was under the influence of the shock of the loss of his lover, the shock of his own wounds and recently emerging from general anesthesia with abdominal surgery and that his will and strength and clarity of mind were all impaired. It is more likely than not that at the time he was interrogated by the police and given his *Miranda* rights, his emotional state was so impaired that he would not have been able to resist effectively the demands of the police at the time or the requests of the police. It would seem that his statement would not be totally voluntary, as he may choose, when in a clearer state of mind, to resist giving such a statement, especially under the advice of his attorney, if he had been allowed to see his attorney prior to the interrogation.

The note of Dr. Antonowicz, the psychiatrist who examined him in consultation one day after he was admitted and then three days later, indicated a clearing of his sensorium on the second examination. This implies that his first examination showed Scot to be less than clear, and that was one

20

day after his admission or one day after the interrogation. . . .

Thus, it is for all these reasons that it is my opinion, within reasonable medical certainty, that at the time of the taking of the statement by the police, Scot Reinert was in such a weakened state of emotional condition following the shock to his system from the death of his lover, the wounds that he had to his own body, the medication that he was under, the loss of blood, the surgical procedure under general anesthesia, that his mental state was not clear enough for him to be competent to waive his *Miranda* warnings or to give a truly voluntary statement.

We find these arguments underwhelming, and conclude that they do not even come close to rendering the state trial judge's findings of fact unreasonable under the totality of the record, or in any way undermine her conclusions of law under the AEDPA standard. The Bornfriend and Sadoff affidavits are extremely generalized and conclusory and, at all events, do not counter the considerable evidence of Reinert's competence to waive his *Miranda* rights and to make a statement which was credited by the suppression judge, to whose findings heavy deference is owed under AEDPA. Indeed, they also rely on statements that the judge discredited. Additionally, we note that the Superior Court also made findings of fact consonant with those of Judge McGinley, *see supra* Part II, which are entitled to deference. *See Sumner v. Mata*, 449 U.S. 539 (1981).[4]

---

[4] Reinert urges us to follow the example of the Supreme Courts of Minnesota and Alaska and rule that, in the absence of an electronic record of the custodial interrogation in the hospital (by either audiotape or videotape), we should suppress the confession as a violation of the Fifth Amendment, Sixth Amendment, protections of due process, protection against self-incrimination, and provisions for effective assistance of counsel and confrontation. *See State v. Scales*, 518 N.W.2d 587 (Minn. 1994) (holding that custodial interrogations must be recorded where feasible); *Stephan v. State*, 711 P.2d 1156 (Alaska 1985) (holding that non-recorded statements made during the course of a custodial interrogation should be suppressed because they were obtained in violation of the Due Process Clause of the Alaska Constitution). While the advocated policy may be a desirable one, Reinert can point to no Pennsylvania law supporting it; indeed there is none. Even if there were such a rule announced in Pennsylvania, we, as a federal court sitting in habeas jurisdiction, would not have the authority to review a violation of the state constitution. It therefore goes without saying that, given that there is no right to recorded custodial interrogations under Pennsylvania law, we are certainly not at liberty to create one. Insofar as Reinert invokes the Fifth and Sixth Amendments of the Federal Constitution, he invokes a

## IV. The Ineffective Assistance of Counsel Claims

### A. Failure of State Trial Counsel to Call a Medical Expert to Testify at the Suppression Hearing as to Reinert's Alleged Mental and Physical Inability to Voluntarily and Knowingly Waive His *Miranda* Rights

Reinert claims that his trial counsel was ineffective for failing to call an expert medical or psychiatric witness to testify about his physical and mental condition at the time he waived his *Miranda* rights. In order successfully to claim ineffective assistance of counsel, Reinert must establish both that his attorney's performance was objectively unreasonable and that, but for the deficient performance, there would have been a reasonable probability of a different outcome. *See Strickland v. Washington*, 466 U.S. 668 (1984). Reinert can make neither showing here. After reviewing the record, the Superior Court found that trial counsel thoroughly cross-examined all the Commonwealth's witnesses regarding Reinert's mental and physical state at the time he was given his *Miranda* warnings and when he made statements to the police

_____

purported federal right to have a custodial interrogation recorded. He does not, however, cite any authority for this proposition; again there is none. We will, at this juncture, decline to infer a federal right to have custodial interrogations recorded.

and medical staff: "We conclude that trial counsel was not ineffective for failing to call medical experts at the suppression hearing." Indeed, the state court followed the relevant Pennsylvania authority for the proposition that trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. *See Commonwealth v. Williams*, 640 A.2d 1251, 1265 (Pa. 1994). Trial counsel was surely able to do so here.

The Superior Court's rejection, under *Williams*, of Reinert's claim that his trial counsel was ineffective for failing to call an expert witness with respect to his mental and physical condition was not an unreasonable application of the standards set forth in *Strickland* in light of the evidence from police officers and medical personnel that Reinert's waiver of his *Miranda* rights was knowing and voluntary. Reinert's claim must therefore fail. Furthermore, we reject the notion, advanced at oral argument, that Reinert should be entitled to an ineffective assistance of counsel hearing at this juncture. Given the well developed record in this case and our analysis of it above, we do not see what more useful information could be elicited at this time.

### B. Failure to Inform Reinert of His Right to Testify at the Suppression Hearing

Reinert contends that his state trial counsel was ineffective for not informing him of his right to testify at the suppression hearing. At the suppression hearing Reinert's counsel called his

22

mother, stepfather, a female friend, and his mother's pastor to testify about his physical condition post-surgery and prior to his statement to the officers. Reinert's mother and stepfather also testified to Reinert's condition prior to his transport to the hospital (and prior to his initial statement). Additionally the medical records of LVMC were before the suppression court. The suppression court thus had before it a considerable amount of evidence supporting Reinert's position that he was not competent to give a statement or to waive *Miranda* rights. We do not see that Reinert's testimony would have added anything to the mix in his favor, and, as the Pennsylvania Superior Court observed, Reinert failed to state with any specificity what his testimony would have been and/or how his testimony would have altered the outcome of the hearing. The Superior Court concluded that Reinert had failed to establish that his claim had arguable merit, that his counsel's actions were unreasonable, or that he suffered prejudice. In our view, the District Court correctly concluded that the state court's resolution of this claim was not objectively unreasonable. The Superior Court also found that Reinert had failed to show that he was prejudiced by the failure of counsel to inform him of his right to testify at the suppression hearing, *i.e.*, that there was a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.[5]

_____

[5]While we need not decide whether counsel's performance was deficient, it is worth noting that Reinert's testimony

might have been risky to his defense. Reinert testified extensively at trial about the entire incident leading up to and following the death of Sean Brady. By taking the stand at the suppression hearing, Reinert may have been providing the Commonwealth with the means to impeach his testimony. In *United States v. Salvucci*, 448 U.S. 83, 93-94 (1980), the Supreme Court reserved the question whether *Simmons v. United States*, 390 U.S. 377 (1968), precludes the use of a defendant's testimony at a suppression hearing to impeach his testimony at trial. The Court noted, however, that a number of courts considering the question had held that such testimony is admissible as evidence of impeachment. *Id.* at 94 & n.8 (citing *Gray v. State*, 403 A.2d 853, 858 (Md. Ct. Spec. App. 1979) (noting that nothing in *Simmons* precludes use of defendant's testimony at suppression hearing for purpose of impeachment at trial); *People v. Sturgis*, 317 N.E.2d 545, 547-48 (Ill. 1974) (same); *People v. Douglas*, 136 Cal. Rptr. 358, 363 (Cal. Ct. App. 1977) (holding that defendant's testimony at suppression hearing was admissible for impeachment purposes because defendant took the stand in his trial and testified in a manner inconsistent with his pretrial testimony)). Were we to adopt a similar interpretation of *Simmons* and conclude that suppression testimony was fair game for impeachment purposes, the action of putting Reinert on the stand during the suppression hearing could have *itself* potentially become subject to

Finally, we consider the affidavit submitted by Reinert's trial attorney Diane Dickson. In our view, the Dickson affidavit, which constitutes a conclusory concession of ineffectiveness by trial counsel, does not mitigate the propriety of the actions taken during the time of trial, and does not affect the outcome.

## V. Conclusion

In light of our extensive review of the record before us, we conclude that the state trial court's decision to deny Reinert's motion to suppress the statements at issue was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, and that it was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. To the extent that the state trial court's finding on the one pre-*Miranda* statement made to Officer Zimmerman was in fact unreasonable in light of the evidence presented before it, the statement should have been suppressed. However, the admission of duplicative statements was proper, and the error was therefore harmless.

As for Reinert's claims of ineffective assistance of counsel, he has failed to demonstrate that he was prejudiced by his counsel's performance, and the state court's conclusions on the issue were not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

We will therefore affirm the order of the District Court denying the petition.

---

an allegation of ineffectiveness.

24