

Opinions of the United
States Court of Appeals
for the Third Circuit

2006 Decisions

1-3-2006

# USA v. Kiam

Precedential or Non-Precedential: Precedential

Docket No. 05-1384

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Kiam" (2006). *2006 Decisions.* Paper 1687.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1687

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-1384

_____

UNITED STATES OF AMERICA

v.

LONG TONG KIAM

<u>Appellant</u>

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 04-cr-0436)
District Judge: Honorable Stewart Dalzell

_____

Argued December 5, 2005

Before: RENDELL, FISHER, and VAN ANTWERPEN, <u>Circuit
Judges</u>.

(Filed: January 3, 2006)

Patrick L. Meehan
Robert A. Zauzmer
Barry Gross (Argued)
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for the Government*

Stephen J. Britt (Argued)
Donnelly & Associates P.C.

100 West Elm Street
Suite 101
Conshohocken, PA 19428

*Counsel for Appellant*

———

OPINION OF THE COURT

———

VAN ANTWERPEN, Circuit Judge.

Appellant Long Tong Kiam was convicted by a jury on November 3, 2004, of three counts of alien smuggling in violation of 8 U.S.C. § 1324(a)(2)(B)(iii). His conviction arose from his arrest at Philadelphia International Airport after bringing three Chinese nationals illegally into the country. On February 4, 2005, the District Court sentenced Kiam to five years imprisonment and two years of supervised release. This appeal stems from the District Court's denial of Kiam's motion to suppress a confession he gave to an Immigration and Customs Enforcement agent while being questioned at the airport. Kiam contends the confession was invalid under Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004), because, although it was obtained after Miranda[1] warnings were given, Kiam had already given inculpatory statements to another agent without the benefit of Miranda. We disagree and will affirm the District Court's denial of the motion to suppress.

I.

On April 27, 2004, Long Tong Kiam, a Singaporean citizen with a valid Singapore passport, arrived on a Frankfurt-Philadelphia flight at Philadelphia International Airport. He – along with three Chinese nationals who had been sitting together but apart from Kiam – was escorted by Customs and Border Patrol

———

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

2

inspectors to a secondary inspection area.[2]  In the previous week, Customs and Border Patrol agents had uncovered several alien smuggling schemes whose characteristics matched those of Kiam and the Chinese nationals.  Each of the Chinese nationals on Kiam's flight had presented Singaporean passports in Frankfurt, although they did not have passports with them in Philadelphia.

Kiam was first interrogated by Customs and Border Patrol Senior Inspector Daniel Roman for about twenty five minutes.  During the interrogation, Inspector Roman suspected Kiam of lying regarding: (1) whether he had recently traveled to Thailand, Turkey, and Europe, as reflected by his passport; and (2) whether he knew the three Chinese nationals on the airplane who had been traveling together.  After Inspector Roman confronted Kiam with discrepancies based upon his passport entries and statements by the Chinese nationals, Kiam admitted that he knew the aliens, and was "illegally help[ing] them enter this country."  United States v. Kiam, 343 F. Supp. 2d 398, 401 (E.D. Pa. 2004).  Inspector Roman did not give Kiam Miranda warnings at any time during this interrogation.

Inspector Roman then contacted Immigration and Customs Enforcement, which dispatched Immigration and Customs Enforcement Special Agent Richard Kozak to the airport.  Inspector Roman did not further question Kiam.  Upon arrival, Agent Kozak called a Chinese interpreter who determined that Kiam spoke many languages; Kiam indicated that he wished to speak in English.  Agent Kozak then administered Miranda warnings, both in English and through the interpreter.  Kiam waived these rights and filled out an official waiver form. Over the next three hours Agent Kozak interrogated Kiam about the smuggling scheme, and eventually Kiam described the alleged scheme's mastermind along with their past dealings and the current trip to America. Kiam then wrote down his confession and signed it with amendments.  He was subsequently arrested.

---

[2]Kiam was not in handcuffs and was taken to an office for an interview. Kiam went with inspectors voluntarily. This secondary inspection area was located behind the primary Immigration inspection booths.

3

Kiam was indicted by a federal grand jury on three counts of alien smuggling. In the District Court for the Eastern District of Pennsylvania, which had jurisdiction pursuant to 18 U.S.C. § 3231, Kiam sought to suppress the confession he had given to Agent Kozak on the ground that it was elicited through an unconstitutional two-round interrogation strategy which was designed to sidestep his Miranda protection. The District Court denied the motion to suppress on October 22, 2004, holding that while Inspector Roman should have given Kiam Miranda warnings during the first interrogation, any alleged taint from the pre-Miranda statement did not extend into the second, post-Miranda confession. On November 3, 2004, after the written confession was presented at trial along with the testimony of the three Chinese nationals Kiam allegedly smuggled into the country, Kiam was found guilty by a jury of all three counts of alien smuggling. On February 4, 2005, the District Court sentenced Kiam to 60 months imprisonment, a special assessment of $300, and 24 months of supervised release. Kiam now appeals the District Court's denial of his motion to suppress. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## II.

Our review of the District Court's factual findings in a suppression hearing is for clear error. United States v. Naranjo, 426 F.3d 221, 226 (3d Cir. 2005). Our review of legal rulings and mixed questions of law and fact is plenary. Id.

## III.

We will address both elements of the District Court's decision not to suppress Kiam's second statement. First, we conclude that the District Court erred in holding that Kiam was entitled to Miranda warnings before he made his inculpatory statements to Inspector Roman. Second, however, we agree with the District Court's ultimate conclusion that regardless of whether the first statements were unwarned, these pre-Miranda statements did not taint the post-Miranda confession. Accordingly, whether or not the first statements required Miranda, the District Court properly denied the motion to suppress the second confession.

4

## A. Initial Interrogation

The District Court first held that Inspector Roman should have administered <u>Miranda</u> warnings during the initial interrogation because the questioning went beyond "routine" admissibility inquiries, and that the failure to do so might have rendered his second confession inadmissible. <u>Kiam</u>, 343 F. Supp. 2d at 406. The District Court found that both traditional triggering elements – custody and interrogation – were present. <u>Id.</u> at 403-04. The District Court acknowledged that customs officials *are* permitted to ask aliens stopped at the border questions without <u>Miranda</u> warnings. <u>Id.</u> at 406. However, the District Court concluded, the questions here went beyond merely "routine" immigration issues because Inspector Roman had a "particularized suspicion" that Kiam was involved in criminal conduct. <u>Id.</u>

This was error. For the reasons set forth below, we hold that Kiam was not entitled to <u>Miranda</u> warnings until the criminal investigator was called in because, *inter alia*, Inspector Roman's questions still had a bearing on Kiam's admissibility.

As the Supreme Court has emphasized repeatedly, the inquiry in <u>Miranda</u> cases is not into the officer's subjective intent, suspicion, or views. <u>Stansbury v. California</u>, 511 U.S. 318, 324 (1994) (per curiam) ("It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear on the question whether the individual" requires <u>Miranda</u> warnings"); <u>see</u> <u>also</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 423 (1986) ("[T]he state of mind of the police is irrelevant . . . ."); <u>Seibert</u>, 124 S. Ct. at 2616 (O'Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer."). Moreover, the District Court cited no positive authority in this Circuit or otherwise – nor did Kiam – for the proposition that non-"routine" immigration questions implicate <u>Miranda</u>.[3] Instead, the District Court's analysis

---

[3] Our own search revealed only <u>United States v. Moody</u>, 649 F.2d 124 (2d Cir. 1981), which is not ultimately to the contrary. The

5

involved cases, none of which come from this Court, which stated merely that "the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (quoting United States v. Lueck, 678 F.2d 895, 899 (11th Cir. 1982)).

While it appears that other courts have repeatedly upheld the authority of immigration inspectors to question aliens without Miranda, they have done so by forcing the non-analogous immigration context into normal Miranda jurisprudence and thereby avoiding the issue we address today. The District Court ruled as it did partly because these other courts spoke in the negative – "routine" immigration questions were not held to require Miranda, but no situation presented non-"routine" questions.

We recognize the facially-appealing nature of differentiating between "routine" and non-"routine" questions. However, an inspection of Circuit cases that apply this delineation shows that courts have gone to great pains to label almost all questioning "routine." In Moya, an immigration inspector asked an alien, in a secondary inspection area, pointed questions about past deportations after a computer system had previously confirmed the alien's earlier deportation. As in the present case, the Moya inspector questioned the alien about the exact elements of a crime, yet the Moya court deemed this

_____

Second Circuit held there that interrogating an American citizen in a secondary inspection room of an airport required Miranda warnings. Moody, 649 F.2d at 127-28. That court appeared to lay down a broad rule – as soon as a person is in a "private room" she is in custody for Miranda purposes – that has not been adopted by other Circuits. Cf. United States v. Ventura, 85 F.3d 708, 712 (1st Cir. 1996) (rejecting the District Court's conclusion that travelers were per se in custody for Miranda purposes because they "may not simply walk away from an interrogating officer"). After Moody, the Second Circuit itself refused to require Miranda warnings during secondary inspections. United States v. Silva, 715 F.2d 43 (2d Cir. 1983).

6

simply "routine." 74 F.3d at 1119-20 (quoting older Eleventh and Fifth Circuit cases); see also United States v. Bengivenga, 845 F.2d 593, 599 (5th Cir. 1988) (en banc) (admitting statements obtained through pre-Miranda questioning even after border agents' "activity shifted from a routine checkpoint stop aimed at detecting illegal aliens to an investigation of drug smuggling").

The Seventh Circuit confronted a situation virtually identical to the case at hand in United States v. Gupta, 183 F.3d 615 (7th Cir. 1999). A suspected alien smuggler in secondary inspection admitted the smuggling scheme and signed a confession after receiving Miranda warnings from newly-arrived criminal investigators. Writing for the Gupta court, Judge Easterbrook refused to decide where the "routine questions asked of travelers at the border" ended in that case, because the post-Miranda statements were admissible under Oregon v. Elstad regardless. Gupta, 183 F.3d at 618.[4]

We now reaffirm the well-established authority of border inspectors to ask questions of those entering the United States. See, e.g., 8 U.S.C. § 1225(b); Gupta, 183 F.3d at 617; United States v. Fernandez-Ventura, 132 F.3d 844, 846-47 (1st Cir. 1998); Moya, 74 F.3d at 1119-20; United States v. Layne, 973 F.2d 1417, 1420-21 (8th Cir. 1992); Bengivenga, 845 F.2d at 598.

"A person seeking entry into the United States does *not* have a right to remain silent." Gupta, 183 F.3d at 617. An alien at the border of our country – even if that border is the

---

[4]The Government suggested at argument that if we choose to draw a "routine" questioning line beyond which Miranda warnings are required, then we should find this case analogous to United States v. Ozuna, 170 F.3d 654 (6th Cir. 1999), and hold that Inspector Roman stayed within "routine" questions. Ozuna does not stretch so far. The alien in Ozuna was questioned in a secondary inspection area about discrepancies regarding his identity and citizenship. We decline in the first instance to adopt a "routine" questioning demarcation line.

Philadelphia International Airport, as here – must convince a border inspector of his or her admissibility to the country by affirmative evidence. See, e.g., 8 C.F.R. § 235.1(d)(1) ("Each alien seeking admission . . . must establish to the satisfaction of the inspecting officer that the alien is . . . entitled, under all of the applicable provisions of the immigration laws and this chapter, to enter the United States."). While an alien is unquestionably in "custody" until he is admitted to the country, normal Miranda rules simply cannot apply to this unique situation at the border. See Gupta, 183 F.3d at 617-18 ("Miranda therefore is a mismatch for the immigration process, at least at the outset. . . . [P]ersons seeking entry at the border may be questioned without Miranda warnings, even though they are also subject to custody . . . ."). This is a situation utterly unlike a normal law enforcement setting. The alien may be taken out of a primary inspection line for secondary questioning, or as here, removed from a plane before reaching that initial line. Contrary to Kiam's assertions, there is no functional difference between the preceding situations. See Fernandez-Ventura, 132 F.3d at 847 ("[W]e fail to see how going directly to secondary inspection [and skipping primary inspection] makes the questioning more coercive."). In either event, the alien still must meet his information production burden, and the border inspector is accordingly entitled to ask questions and require answers.

We will not impose an across-the-board rule requiring border inspectors to immediately cut off their questioning if they think they may be going beyond what could be considered "routine" immigration questioning. Nor will we extend Miranda beyond the holdings of our sister Circuits and hold that if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the alien before questioning him on any subject. Not only would such a rule conflict with Stansbury and other Miranda jurisprudence, but it would also run afoul of the need for clear rules in the Miranda context. See, e.g., Berkemer v. McCarty, 468 U.S. 420, 430 (1984).

The Seventh Circuit has stated that eventually, a "line must be drawn," beyond which Miranda warnings are required.

<u>Gupta</u>, 183 F.3d at 618. We see only one line to draw – at some point, as was the case here and in <u>Gupta</u>, a Customs and Border Patrol inspector will have sufficient information to make a determination regarding admissibility and will then decide whether to call in a criminal investigator such as Immigration and Customs Enforcement Agent Kozak.[5] <u>Miranda</u> may then apply. <u>Accord</u> <u>Gupta</u>, 183 F.3d at 618 (citing as a possible demarcation the "arrival of criminal investigators"). If the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution, however, this line has been crossed.[6]

Before this point, there is not likely to be the "restraint on freedom of movement of the degree associated with a formal arrest" in normal immigration practice, where questioning and delay is the norm. <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)). This is the only possible "line" which sufficiently reflects the deference due inspectors at the border of the United States. We decline the urging of Kiam to require

---

[5]We, like the Supreme Court, certainly do not condone the deliberate sidestepping of <u>Miranda</u>. Inspector Roman followed established procedure in interrogating Kiam and calling in Agent Kozak at a reasonably early point. Agent Kozak then administered <u>Miranda</u> warnings and proceeded to obtain a written, detailed confession that went far beyond any initial information given to Inspector Roman. Kiam does not challenge the District Court's finding that there was not a deliberate omission of <u>Miranda</u> warnings.

[6]For example, if an alien admits to an immigration/customs inspector that he is smuggling drugs into the country, it might be improper for the inspector to proceed to question the alien, without <u>Miranda</u>, regarding the weight, purchase, and plans for, the drugs he is smuggling. Here, once Kiam admitted the elements of his inadmissibility, Inspector Roman ceased his questioning and called in Agent Kozak. Contrary to Kiam's assertions, the mere overlap of the admissibility questioning with the elements of his criminal liability is not fatal.

<u>Miranda</u> warnings as soon as an alien is taken off a plane or sent for secondary inspection.

While appealing on the surface, we note the impossibility of the District Court's "particularized suspicion" test. An alien reentering the country after being deported is guilty of a criminal offense. 8 U.S.C. § 1326. Aliens applying for admission at the border are routinely run through a system to check their immigration history. A positive match to a previously-deported alien would lead to secondary inspection, and would surely create a "particularized suspicion" in the mind of any immigration inspector that this alien was guilty of a crime. The criminal offense of illegal reentry is inextricably tied up with the alien's current admissibility, yet by the District Court's reasoning, an immigration inspector would first have to administer <u>Miranda</u> warnings before questioning the alien about that admissibility. <u>Cf.</u> <u>Moya</u>, 74 F.3d at 1119 (permitting an immigration inspector to question an alien, without <u>Miranda</u> warnings, after an INS system indicated that the alien had previously been deported, and was therefore attempting to illegally reenter the country).

Here, the record shows that Kiam was determined to be administratively inadmissible because of the same conduct which formed the basis for his criminal indictment – alien smuggling. 8 U.S.C. § 1182(a)(6)(E)(i). Suspicion of criminal conduct cannot overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders. <u>See</u> <u>United States v. Silva</u>, 715 F.2d 43, 48 (2d Cir. 1983) (holding that regardless of whether an immigrations inspector had probable cause to arrest for a criminal violation, a customs officer remained "duty-bound to determine whether Silva was entitled to enter the country with her effects" and <u>Miranda</u> warnings were not required).

We do not disagree with the holdings of any of our sister Circuits, who have as a functional matter upheld almost all pre-<u>Miranda</u> questioning during border detentions. Attempting to force these cases into the rubric of "routine" questioning, however, ignores the very real issues of border immigration practice.

10

Here, Kiam was not entitled to <u>Miranda</u> warnings before he made his first incriminating statements to Inspector Roman. At the point at which Inspector Roman ceased questioning about administrative admissibility and called in a criminal investigator, however, <u>Miranda</u> was implicated – and such warnings were indeed given at this proper time by Agent Kozak. It was error for the District Court to conclude that <u>Miranda</u> warnings were needed before Inspector Roman could question Kiam. However, as we explain below, the second statement is clearly admissible regardless.

## B. Two-Stage Interrogation Under <u>Elstad</u> and <u>Seibert</u>

We do not agree with the District Court that under the facts before us Kiam should have been given <u>Miranda</u> warnings while speaking with Inspector Roman. As such, Kiam's statement to Agent Kozak, which was taken after <u>Miranda</u> warnings were given, is admissible. We write further to briefly clarify the proper analysis to follow had the District Court been correct, and the first statement actually been improperly unwarned. Under this analysis, the District Court was correct that Kiam's post-<u>Miranda</u> confession to Agent Kozak was admissible regardless.

The Supreme Court addressed this issue first in <u>Oregon v. Elstad</u>, 470 U.S. 298, 314 (1985), in which the Court held that "absent coercion or improper tactics in obtaining the initial statement," a post-<u>Miranda</u> statement would not be automatically excluded because of an earlier, pre-<u>Miranda</u> confession.[7] The Court instructed lower courts to "examine the surrounding circumstances and the entire course of police conduct with

---

[7]In <u>Elstad</u>, police went to the home of a burglary suspect and briefly questioned him before arresting him, bringing him to the station house, and giving <u>Miranda</u> warnings. The suspect then made a full confession. The Supreme Court ruled that the second statement should be admissible despite the conceded inadmissibility of the first, pre-<u>Miranda</u> statement, and the Court refused to apply a "fruit of the poisonous tree" analysis to the Fifth Amendment. <u>Elstad</u>, 470 U.S. at 303-06.

11

respect to the suspect in evaluating the voluntariness of his [initial] statements." Elstad, 470 U.S. at 318. Where no coercion is found, "a careful and thorough administration of Miranda warnings cures the condition that rendered the unwarned statement inadmissible." Reinert v. Larkins, 379 F.3d 76, 90 (3d Cir. 2004) (citing Elstad, 470 U.S. at 311-12).

The Supreme Court recently revisited this issue in Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004). A four-member plurality held that courts should apply a five-factor test[8] to determine the admissibility of a second confession given after a pre-Miranda statement. Seibert involved an official, wide-spread police protocol which directed officers to interrogate suspects extensively without Miranda warnings, obtain a confession – which the officers knew could not be used in court – then adjourn briefly, return and give the suspect his Miranda rights, and re-elicit a now-valid confession.

Justice Kennedy, supplying the fifth vote to exclude the confession at issue, narrowed the test to two parts. First, a court must decide whether the officers made a "deliberate" choice to flout Miranda in the first round of interrogation. Seibert, 124 S. Ct. at 2616 (Kennedy, J., concurring). If so, the second confession could still be admitted if "curative" measures were taken – for example, a sufficient break in time or circumstances between interrogations, or a warning to the suspect that the first statement could not be used against him. Id. If the failure to give Miranda warnings was *inadvertent*, however, Justice Kennedy stated that "[t]he admissibility of postwarning statements should continue to be governed by the principles of

---

[8]    (1) "[T]he completeness and detail of the questions and answers in the first round of interrogation";
(2) "[T]he overlapping content of the two statements";
(3) "[T]he timing and setting of the first and the second" rounds;
(4) "[T]he continuity of police personnel"; and
(5) "[T]he degree to which the interrogator's questions treated the second round as continuous with the first."
Seibert, 124 S. Ct. at 2612; see also Naranjo, 426 F.3d at 229-31.

Elstad." <u>Seibert</u>, 124 S. Ct. at 2616 (Kennedy, J., concurring).

This Court applies the <u>Seibert</u> plurality opinion as narrowed by Justice Kennedy. <u>Naranjo</u>, 426 F.3d at 231-32 (citing <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977)).

The first question under <u>Seibert</u> is whether Inspector Roman deliberately used a two-step interrogation process. The District Court concluded that there had been no deliberate attempt to sidestep <u>Miranda</u>, and Kiam does not contest the holding on appeal.

Once we determine that the <u>Miranda</u> violation was not deliberate, we must fall back on <u>Elstad</u> as instructed by Justice Kennedy. The District Court appears to have implicitly concluded that Kiam's claim failed under <u>Elstad</u>, and then in the name of thoroughness proceeded to show that Kiam's claim would also fail under the five <u>Seibert</u> plurality factors. <u>Kiam</u>, 343 F. Supp. 2d at 409-11. The District Court's analysis of the five <u>Seibert</u> factors was not faulty, but it was unnecessary, having found the initial failure to give <u>Miranda</u> warnings inadvertent. The District Court should have proceeded solely under <u>Elstad</u>.

Applying the traditional <u>Elstad</u> test, we conclude that Kiam's confession to Agent Kozak was not "tainted" by the first, pre-<u>Miranda</u> statement in such a way as to require its suppression. First, there was no evidence of coercion or improper tactics in Inspector Roman's questioning of Kiam. <u>See also</u> <u>United States v. Ventura</u>, 85 F.3d 708, 711 (1st Cir. 1996) ("[Q]uestions from officials are especially understood to be a necessary and important routine for travelers arriving at American entry points. This understanding cuts against the potentially coercive aspect of the Customs inquiry, and lessens the need for <u>Miranda</u> warnings.").

Second, Agent Kozak gave "a careful and thorough administration of <u>Miranda</u> warnings." <u>Reinert</u>, 379 F.3d at 90. The District Court found that upon meeting Kiam and obtaining an interpreter by phone:

13

"Kozak gave Kiam <u>Miranda</u> warnings. Despite Kiam's English preference, Wong [the interpreter] methodically ensured that Kiam understood each sentence of the warnings. For instance, after Kozak read aloud each sentence, Wong asked Kiam in Mandarin whether he understood, providing additional explanation when necessary. When Kozak finished explaining these rights at 5:18 p.m., Kiam waived them, memorializing this on an ICE I-214 form."

<u>Kiam</u>, 343 F. Supp. 2d at 402. There was no clear error in these findings. <u>See</u> <u>Elstad</u>, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made."). Had a <u>Seibert</u> or <u>Elstad</u> analysis been ultimately necessary here, we "conclude that the cure mandated by <u>Elstad</u> was met in this case, and that because [Kiam's] waiver was knowing and voluntary, the post-<u>Miranda</u> statement was properly entered into evidence." <u>Reinert</u>, 379 F.3d at 91.

IV.

For the foregoing reasons, we conclude that the District Court properly refused to suppress Kiam's statement to Agent Kozak. Accordingly, the judgment of the District Court will be affirmed.