NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3210
_____

UNITED STATES OF AMERICA

v.

TYSHAUN ST. VALLIER
                            Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 07-cr-613)
District Judge: Hon. Susan D. Wigenton
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 17, 2010

Before: JORDAN, HARDIMAN and VAN ANTWERPEN, *Circuit Judges*.

(Filed: December 22, 2010 )
_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, *Circuit Judge*.

Tyshaun St. Vallier ("St. Vallier") was convicted of one count of knowingly and intentionally importing 500 grams or more of cocaine into the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(2)(B), and one count of conspiracy to import 500 grams or more of cocaine into the United States contrary to 21 U.S.C. §§ 952(a) and

960(b)(2)(B), in violation of 21 U.S.C. § 963. Pursuant to this conviction, the District Court sentenced St. Vallier to 204 months of imprisonment. St. Vallier appeals his conviction and sentence contending that: (1) the District Court erred by denying his motion to suppress statements made to customs officers in Newark Liberty International Airport; (2) the District Court erred by preventing the impeachment of a key prosecution witness; (3) the Government violated his Fourteenth Amendment rights by knowingly using perjured testimony; (4) the District Court erred by precluding the introduction of certain evidence at trial; (5) the District Court erred by denying his motion for a new trial; (6) defense counsel rendered ineffective assistance; and (7) the District Court abused its discretion by imposing a procedurally and substantively unreasonable sentence.

Based on our conclusion that the District Court committed no error at trial, that the Government did not knowingly use perjurious testimony, and that St. Vallier's ineffective assistance claims are unready for review on direct appeal, we will affirm St. Vallier's judgment of conviction. We will, however, vacate St. Vallier's sentence and remand for resentencing due to a procedural error committed by the District Court.

## I.

Because we write solely for the parties' benefit, we assume familiarity with the case and discuss only those facts relevant to our decision.

On May 6, 2007, St. Vallier, along with co-conspirators Ezra McCombs ("McCombs") and Charisse LaRoche ("LaRoche"), traveled from Port of Spain, Trinidad to Newark, New Jersey. Upon arrival at Liberty International Airport in Newark, each individual proceeded to separate customs lines. Unbeknownst to them, officers working

2

for United States Customs and Border Protection had flagged them for secondary inspection. Accordingly, customs officers escorted all three individuals to a secondary inspection area of the airport. On the way, St. Vallier was taken to the baggage claim to retrieve his single checked item of luggage.

Following arrival in the secondary inspection area, Customs Officer Jorje Erraez questioned St. Vallier. In response to Officer Erraez's questions, St. Vallier indicated that he had travelled to Trinidad for vacation. He additionally stated that he knew McCombs, but denied knowing LaRoche. Officer Erraez thereafter confronted St. Vallier with a copy of LaRoche's travel itinerary, which he had located in St. Vallier's single checked luggage bag. St. Vallier then acknowledged knowing LaRoche, and stated that she was McCombs' girlfriend. No *Miranda* warnings were provided prior to questioning St. Vallier.

Upon discussion, Officer Erraez and other customs officers who had separately interviewed LaRoche and McCombs discovered inconsistencies in each individual's responses. Notably, McCombs stated that LaRoche was St. Vallier's girlfriend, directly contradicting St. Vallier. Based on this and other inconsistencies, Officer Erraez obtained permission from his supervisor to conduct a personal search of St. Vallier. Although no contraband was found, Officer Erraez located a credit card used to acquire LaRoche's plane ticket and several thousand dollars in cash.

Meanwhile, based on inconsistent statements made by LaRoche, customs officers obtained permission to search three suitcases checked in her name. Customs officers discovered within a large amount of powder and liquid cocaine. LaRoche was then

3

escorted to a personal search room where she admitted to concealing cocaine inside her body as well. In addition, LaRoche made statements implicating St. Vallier in the smuggling plan. In total, 3,280 grams of liquid and powder cocaine were seized from LaRoche's three suitcases and body.

Upon learning that customs officials had discovered cocaine, Officer Erraez ceased questioning and searching St. Vallier. Shortly thereafter, agents from Immigration and Customs Enforcement ("ICE") arrested both St. Vallier and McCombs. ICE provided St. Vallier a written statement of rights including *Miranda* warnings. St. Vallier chose to exercise his *Miranda* rights.

On July 24, 2007, a grand jury sitting in Newark, New Jersey, returned a two-count indictment against St. Vallier charging him with one count of knowingly and intentionally importing 500 grams or more of cocaine into the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(2)(B), and one count of conspiracy to import 500 grams or more of cocaine into the United States contrary to 21 U.S.C. §§ 952(a) and 960(b)(2)(B), in violation of 21 U.S.C. § 963. After pleading not-guilty, St. Vallier failed to appear for a scheduled court date. Accordingly, on November 20, 2008, the grand jury returned a superseding indictment adding a third count charging St. Vallier with willfully failing to appear, in violation of 18 U.S.C. § 3146(a)(1) and (b)(1)(A)(i). St. Vallier was subsequently apprehended by authorities and plead guilty to that offense.

Prior to trial, St. Vallier filed a motion to suppress statements he made to customs officials during the questioning conducted in the secondary inspection area of Liberty International Airport. St. Vallier contended that these statements were made while he

4

was subject to custodial interrogation, thus entitling him to warnings as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Because no such warnings were provided prior to questioning, he argued that the statements made to customs officials were inadmissible at trial. The District Court rejected this argument and denied St. Vallier's motion.

Trial commenced on April 23, 2009. Five days later the jury returned a guilty verdict on both counts of importation and conspiracy to import cocaine. Thereafter, St. Vallier filed a motion for a new trial arguing, *inter alia*, that the court erred by allegedly preventing him from impeaching McCombs regarding testimony on St. Vallier's use of a specific cellular phone to make calls and text messages to Trinidad in furtherance of the drug importation conspiracy. St. Vallier additionally argued that testimony provided by ICE Agent Riley left the jury with the false impression that funds seized from St. Vallier on the day of his arrest were narcotics proceeds.[1] The District Court denied St. Vallier's motion on July 8, 2009.

On August 3, 2009, the District Court sentenced St. Vallier to 204 months of incarceration followed by five years of supervised release. Prior to and during the sentencing proceeding, St. Vallier contested the guidelines calculation of his criminal history category as set forth within his Pre-Sentence Report ("PSR"). Specifically, St. Vallier contended that the PSR contained an error indicating that he served the entirety of

---

[1] On appeal, St. Vallier reiterates these two particular arguments. *See infra* II. A., B., and C.

a 364 day term of incarceration pursuant to an earlier conviction when, according to him, the sentence was actually suspended.[2]

When factored into the overall calculation, the presence of this allegedly mistaken period of incarceration resulted in the addition of three points to St. Vallier's criminal history category. The District Court overruled St. Vallier's objections, finding that representations provided by defense counsel were insufficient to dispute the accuracy of the PSR. Accordingly, when calculating St. Vallier's sentence for the current offenses, the court took the prior sentence into account as represented in the PSR. Following sentencing, the Government confirmed that St. Vallier's 364 day sentence was indeed suspended as claimed.

St. Vallier now appeals both his conviction and sentence.

## II.

The District Court possessed jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over the challenges to the conviction pursuant to 28 U.S.C. § 1291 and over the challenges to the sentence pursuant to 18 U.S.C. § 3742(a).

### A. Motion to Suppress

---

[2]     The Probation Office overruled St. Vallier's initial objections based on a phone conversation with a representative from the Clerk's Office of the Superior Court for Essex County, who confirmed that St. Vallier had received a sentence of 364 days of incarceration. (PSR ¶ 64.) During the sentencing proceeding, the Assistant United States Attorney did not produce evidence to prove the disputed PSR allegation, and instead argued that even if St. Vallier had in fact received a suspended sentence, the difference would not affect the ultimate calculation of his criminal history category. This assertion later proved incorrect, as conceded by the Government. (Government's Br. at 42.)

St. Vallier argues that the District Court erred in denying his motion to suppress statements made to customs officials at Newark Liberty Airport.[3] In support of this claim, St. Vallier contends that he was subjected to custodial interrogation from the moment customs officers directed him to leave the general customs area of the airport terminal. Therefore, he argues, customs officers were required to provide *Miranda* warnings prior to questioning and that their failure to do so renders his statements inadmissible at trial.

The District Court rejected similar arguments during the suppression hearing and denied St. Vallier's motion based on its determination that he was not subjected to custodial interrogation for *Miranda* purposes, given that the questioning occurred at the international border. The court explained that at the time St. Vallier was questioned by Customs Officer Erraez, "he was not free to leave, but he was not – it was not a custodial interrogation for purposes of Miranda." (Supp. App. at 67.) The court went on to explain that "[t]here are certain exceptions that have been provided as it relates to custodial interrogation, specifically as it relates to border situations." (*Id.*) "This was clearly a border situation," the court found, and "[the] questions that were being asked . . . did not rise to a custodial interrogation, [therefore] . . . there is no need for Miranda warnings to

---

[3] St. Vallier does not specifically identify which statements made to customs officials are at issue here, and instead argues that all of the statements he made once within the secondary inspection area should have been suppressed. (St. Vallier's Br. at 11.) Based on our review of the trial and suppression hearing transcripts, it appears that the statements of relevance here include: St. Vallier's explanation that he traveled to Trinidad on vacation; his statement that he did not know LaRoche; and his subsequent contradictory statement that LaRoche was McCombs' girlfriend. (*See* Supp. App. at 52-55, 67.)

be given to Mr. St. Vallier." (*Id.*) Accordingly, the court denied the motion. For the reasons that follow, we conclude that this denial was proper.

We review the District Court's factual findings in a suppression hearing for clear error. *United States v. Naranjo*, 426 F.3d 221, 226 (3d Cir. 2005). Alternatively, our review of legal rulings and mixed questions of law and fact is plenary. *Id.*

It is well-settled that an individual is entitled to *Miranda* warnings where the government seeks to perform a custodial interrogation. *See, e.g.*, *United States v. Walton*, 10 F.3d 1024, 1026 (3d Cir. 1993). As a general rule, *Miranda* warnings are required to protect a suspect's Fifth Amendment right against self-incrimination. *Miranda*, 384 U.S. at 444-45. Thus, prior to asking any questions of a suspect in custody, law enforcement officers must provide appropriate warnings and notification of rights. *Id.* Any statement that is the product of unwarned custodial interrogation may be barred from use at trial by the exclusionary rule. *See United States v. DeSumma*, 272 F.3d 176, 179-80 (3d Cir. 2001).

A person is subject to custodial interrogation when both the elements of custody and interrogation are satisfied. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). An individual is in custody if, given the circumstances surrounding the interrogation, "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Interrogation, for Miranda purposes refers to express questioning or its "functional equivalent." *Innis*, 446 U.S. at 300-01.

8

As observed by this Court, normal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States. *United States v. Kiam*, 432 F.3d 524, 529-30 (3d Cir. 2006) (describing the "responsibility of immigration or customs agents to inspect entrants at our borders" and explaining that while persons questioned are "unquestionably in 'custody' . . . normal *Miranda* rules simply cannot apply to this unique situation at the border"). [4] Furthermore, whether an individual is questioned in a primary inspection line or removed from the line for secondary inspection has no bearing on the inapplicability of normal *Miranda* rules under such circumstances. *See id.* at 530.

On appeal, St. Vallier contends that he was in custody from the time he was approached by customs officials and consequently that the subsequent questioning absent *Miranda* warnings was impermissible. In making this argument, St. Vallier places undue emphasis on whether or not he was "in custody," and in doing so ignores our holding in *Kiam*. Even if St. Vallier was "in custody" for purposes of *Miranda*, it does not follow

---

[4]     The Presentence Report indicates that St. Vallier is a U.S. Citizen. (PSR at 2.) We note that in *Kiam* the questioning pertained to the admissibility of Kiam, an alien, into the United States, whereas here, if St. Vallier is a U.S. Citizen, the questioning would pertain to whether St. Vallier could bring his effects into the United States. In short, *Kiam* focused on immigration questioning, whereas here, we are faced with customs questioning. Nonetheless, *Kiam* indicated that its reasoning applied to both immigration and customs officials, and that those officials had to determine whether both persons and their effects were entitled to enter the country. *Kiam*, 432 F.3d at 531 ("Regardless of whether an immigrations inspector had probable cause to arrest for a criminal violation, a customs officer remained 'duty bound to determine whether [the alien] was entitled to enter the country with her effects.' (quoting *United States v. Silva*, 715 F.2d 43, 48 (2d Cir. 1983)). Consequently, we find no material distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country.

9

that Officer Erraez was required to provide relevant warnings before conducting the questioning that occurred here. *See Kiam*, 432 F.3d at 529. Custody is not dispositive in the context of border questioning. *See id.* Thus, while St. Vallier may have been in custody for *Miranda* purposes, for the reasons we explained in *Kiam*, this alone does not render Officer Erraez's questioning improper.

Having addressed St. Vallier's custody argument, we now turn to the issue of whether the questions asked by Officer Erraez crossed the boundary we articulated in *Kiam*.[5] In *Kiam*, we acknowledged that at some point a line must be drawn after which *Miranda* requirements might apply even in the context of border questioning. *Kiam*, 432 F.3d at 530. Therein, we explained that "[i]f the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution, however, this line has been crossed." *Id.* Importantly, in acknowledging this limitation, we refused to "hold that if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the alien before questioning him on any subject." *Id.*

This pronouncement reflects the practical reality that determinations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity. *See, e.g.*, *id.* (border inspector properly

---

[5] On appeal, St. Vallier cites our decision in *Kiam* for the proposition that *Miranda* warnings are required once customs officials have completed their admissibility determination and move on to ask questions that only further a criminal prosecution. (St. Vallier's Br. at 13.) He stops short of explicitly arguing that Officer Erraez crossed this line; however, to the extent that his discussion of *Kiam* insinuates that this line was crossed, we disagree.

questioned appellant about his prior travels and association with other passengers on his arrival flight as part of admissibility determination relating to concerns of ongoing human smuggling operation); *United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996) (permitting an immigration inspector to question an alien, without *Miranda* warnings, after an INS system indicated that the alien had previously been deported and was therefore potentially attempting the criminal act of illegal reentry). A criminal offense, such as illegal reentry, may be inextricably tied to a person's admissibility, yet customs officers are not required to provide *Miranda* warnings prior to asking questions that might bear upon this illegal conduct. *See Kiam*, 432 F.3d at 531. The same is true when an officer may suspect that an individual or that individual's effects must be interdicted because of a presently occurring effort or ongoing conspiracy to smuggle drugs across the international border. Accordingly, "[s]uspicion of criminal conduct [does not] overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders." *Id.* Similarly, questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*. *See id.*

The questions asked by Officer Erraez did not cross the line we enunciated in *Kiam*. Although they were arguably directed at determining whether St. Vallier was involved in ongoing criminal activity,[6] they were still integral to Officer Erraez's

---

[6] Officer Erraez testified that when St. Vallier was diverted for questioning he was informed by other customs officials of various red flags including St. Vallier's prior criminal record, the fact that he had paid for LaRoche's ticket, the observation that all three individuals went to separate lines in spite of travel affiliations, and that they had

11

determination of whether St. Vallier's effects could enter the country.[7]  Officer Erraez's

inquiries into St. Vallier's motives for traveling to Trinidad and his associations with

other passengers on his arrival flight reasonably sought to establish basic facts relevant to

such a determination.  At the time of questioning, St. Vallier had neither admitted to nor

been found in possession of direct evidence of criminal activity, even though information

suggested that he and his co-conspirators were providing false answers to customs

officers.  The fact that neither contraband nor an admission of criminal conduct had been

obtained at this juncture further reinforces our conclusion that Officer Erraez's

questioning fell comfortably within the boundary we delineated in *Kiam*.  Therein we

suggested that an admission of criminal conduct or discovery of drugs might represent a

transition point after which questioning could only practically relate to a potential

criminal prosecution.  *Kiam*, 432 F.3d at 530 n.6.  Moreover, once Officer Erraez learned

that cocaine was discovered in LaRoche's luggage, all examination ceased.  (Supp. App.

at 57.)  For these reasons, we conclude that Officer Erraez was not required to provide

*Miranda* warnings prior to eliciting the responses at issue here.

Finding no error in the District Court's factual or legal conclusions, we will affirm

the District Court's denial of St. Vallier's motion to suppress the statements he made to

---

arrived following a short trip to "a source country for narcotics." (Supp. App. at 47-50, 251.)

[7]  Customs officials are explicitly authorized to search and examine persons entering the United States, and seize contraband.  *See* 19 U.S.C. § 1467; 19 C.F.R. §§ 162.6 & 162.21.  Moreover, federal regulations prohibit the importation of controlled substances. 19 C.F.R. § 162.61.  Thus, whether St. Vallier was attempting to smuggle controlled substances into the country from Trinidad had a direct bearing on the admissibility of his effects.

customs officials in Liberty International Airport. We also note that even if the District

Court had erred in denying St. Vallier's motion to suppress, we would view the error as

harmless since other evidence introduced at trial independently established the critical

facts contained in his statements to customs officers.

**B. Attempt to Impeach McCombs and Alleged Prosecutorial Misconduct**

St. Vallier raises two claims concerning testimony presented at trial regarding his

alleged use of various phones in furtherance of the importation conspiracy. First, he

challenges a purported evidentiary ruling by the District Court, which, he contends,

prevented him from introducing critical impeachment material that would have

discredited McCombs by revealing instances of perjury he allegedly committed at trial.[8]

Second, St. Vallier suggests that the Government violated his due process rights by

knowingly using McCombs' allegedly perjurious testimony. Both of these claims fail.

During trial, McCombs testified on direct examination that St. Vallier routinely

used different cell phones, and that he witnessed St. Vallier speaking with persons from

Trinidad on at least one of those phones. (Supp. App. at 354-60.) On cross-examination,

---

[8]    On appeal, St. Vallier's arguments center on his purported efforts to impeach McCombs through another witness, ICE Agent Thomas Sharpe. At one point when summarizing his argument, however, St. Vallier writes that the court erred by "not allow[ing] defense counsel to adequately cross examine the Government's key witness, *Ezra McCombs* . . . ." (St.Vallier's Br. at 17 (emphasis added).) Nowhere else does St. Vallier assert that the court erred by limiting his examination of *McCombs*. Nor does he provide any pertinent citations to the record or develop this argument elsewhere. As such, we will only address at length his arguments concerning the effect of the purported limits on his examination of Agent Sharpe. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("It is also well-settled . . . that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal."). Nonetheless, we note that our review of the record does not indicate any error in the court's rulings during St. Vallier's cross-examination of McCombs at trial.

13

defense counsel for St. Vallier proceeded to question McCombs as to whether he made certain statements regarding St. Vallier's phone use to ICE Agent Thomas Sharpe, later reflected in a warrant affidavit submitted by the agent. (*Id.* at 437-39.)

Following the close of the Government's case, St. Vallier requested permission to call Agent Sharpe as a defense witness, explaining his desire to inquire about steps taken by the Government to investigate the various phone numbers discussed at trial. (Supp. App. at 547.) Defense counsel never mentioned during arguments before the court the intent to bring Sharpe forward specifically for the purpose of impeaching McCombs. After consideration of arguments from both sides, the court ruled as follows:

> The Court: All right. You can call Agent Sharpe. To be honest with you, I don't know where we're going with it, and if your purpose for calling him is about the phone numbers, then it is a very limited area. And I don't want us to go off track and get into all these different phone calls, and what did your investigation consist of, and that sort of thing.
>
> [Defense Counsel]: No, I want to know: Did you investigate this number? Did you determine this number was a landline? Did you determine that no calls were made from this phone to Trinidad?
>
> The Court: All right.

(Supp. App. at 550.) Consistent with the colloquy above, the District Court permitted St. Vallier to call Agent Sharpe. (*Id.* at 588.)

St. Vallier examined Sharpe regarding his efforts to obtain records for various phone numbers presented through prior testimony. (*Id.* at 588-95.) St. Vallier additionally asked Sharpe about several numbers associated with the Appellant, and whether records indicated that any of those numbers were used to call Trinidad. (*Id.* at

14

592-94.) Defense counsel ended questioning thereafter and declined to conduct redirect. (*Id.* at 595-96.)

As to St. Vallier's first claim, our review of the transcript provides no indication that the District Court limited St. Vallier's examination of Agent Sharpe in any way that prevented the impeachment of McCombs. Although the District Court initially sought to restrict the scope of examination prior to agreeing to allow St. Vallier to call Sharpe, the court subsequently acquiesced and allowed St. Vallier to proceed without limitation. When Sharpe was on the witness stand, St. Vallier never asked whether McCombs made affirmative statements to him regarding St. Vallier's use of certain phones to call Trinidad in furtherance of the conspiracy. Instead, Sharpe was asked to examine the contents of a phone in evidence that belonged to McCombs, not St. Vallier, and about steps taken to investigate various phone numbers discussed at trial. (*Id.* at 588-95.) Finally, the three objections sustained by the District Court during defense counsel's examination of Sharpe related solely to issues of leading questions and imposed no limitations on the substance of the examination. Thus, St. Vallier's claim that the District Court prevented impeachment of McCombs is entirely unsupported by the record. To the contrary, the record indicates that St. Vallier's decision not to elicit impeaching testimony was self-imposed. St. Vallier cannot now transform that choice into judicial error. *See United States v. Strothers*, 77 F.3d 1389, 1393 (D.C. Cir. 1996). Thus, St. Vallier's claim fails.

St. Vallier also suggests that the Government violated his due process rights through prosecutorial misconduct. Specifically, St. Vallier contends that the Government

15

knowingly used perjurious testimony when it permitted McCombs to deny making various statements to Agent Sharpe regarding the Appellant's use of a specific cellular phone in furtherance of the importation conspiracy. To succeed on this claim, St. Vallier bears the burden of establishing that: (1) McCombs committed perjury; (2) the Government knew or should have known that McCombs committed perjury but failed to correct his testimony; and (3) there is a reasonable likelihood that the false testimony could have affected the verdict. *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008). A witness commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Because St. Vallier cannot meet his burden as to the first element, we need not address the second and third.

St. Vallier's claim that McCombs committed perjury centers on the following testimony:

> Q: Do you recall speaking to Agent Sharpe?
> A: Yes.
>
> . . .
>
> Q: And during those conversations, did you tell him that Tyshaun St. Vallier used his cellular telephone to call Trinidad to make arrangements for these drug deals?
> A: No, I never told him that.
> [Defense Counsel]: I'll ask that Agent Sharpe be available for the defense case, please. Thank you.
> The Court: Alright.
> Q: So you deny telling him that Tyshaun used his cell phone to call Trinidad?

16

A: I told him that on occasion that me and Tyshaun both spoke on phones in Trinidad, yes.

Q: You didn't tell him Tyshaun's cell phone number by number?

A: No.

Q: You didn't tell him that he used a Samsung assigned telephone number [redacted] in order – a prepaid phone and that you didn't tell him that he used that number to call Trinidad?

A: No, I didn't.

. . .

Q: . . . So you are actually denying that you told Agent Sharpe that the calls were made on Tyshaun St. Vallier's cell phone; is that correct?

A: I'm not denying that calls were made on his cell phone. I'm saying that I didn't tell him that he made the calls.

Q: But you're saying that Tyshaun St. Vallier did make calls on his cell phone?

A: On his cell phone, yes.

Q: Even though there's no record of any call to Trinidad on his cell phone?

A: Right. I told you he had other phones.

(Supp. App. at 438-39, 443.)

St. Vallier's assertion that McCombs lied when providing the answers excerpted above rests on his reading of an amended search warrant affidavit submitted by Agent Sharpe on April 1, 2009. (Sharpe Amend. Affidavit at ¶¶ 9-11.) In this affidavit, Agent Sharpe averred that McCombs told him that St. Vallier used a specific cellular phone, which was the subject of the search warrant, to call and text Trinidad in furtherance of the importation conspiracy.[9] St. Vallier argues that the contents of this affidavit necessarily

---

[9]   In pertinent part, the affidavit provides that:

   "9. I am informed by Ezra McCombs . . . that Tyshaun St. Vallier used the Subject Telephone in furtherance of the conspiracy to import cocaine. 10. Specifically, I was

demonstrate that McCombs lied, that the Government was aware of this fact, and that the Government nonetheless "[held] him out as truthful . . . ." (St. Vallier's Br. at 19.)

We review a district court's factual finding that a witness's testimony was not false for clear error, and "will not disturb that finding unless it is wholly unsupported by the evidence." *Hoffecker*, 530 F.3d at 183. St. Vallier first raised this claim in his memorandum of law in support of his motion for a new trial. The District Court orally denied St. Vallier's motion without making an explicit finding with respect to his allegations of perjury.

Even absent such a finding by the District Court, St. Vallier cannot show on appeal that McCombs committed perjury. Although we recognize that McCombs' statement that he "never told" Agent Sharpe that St. Vallier "used his cellular telephone to call Trinidad to make arrangements for these drug deals" can be read as conflicting with Sharpe's amended affidavit, it is not clear that his response was anything more than the product of confusion, and certainly does not prove that McCombs willfully intended to provide false testimony. *See Dunnigan*, 507 U.S. at 94 ("A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."). McCombs testified that St. Vallier routinely used multiple cell phones. He additionally attempted to explain the apparent conflict

informed by Ezra McCombs that Tyshaun St. Vallier used the Subject Telephone to call individuals in Trinidad who had agreed to supply them with the cocaine seized on May 6, 2007 by ICE. 11. I was also informed by Ezra McCombs that Tyshaun St. Vallier used the Subject Telephone to text individuals in furtherance of the conspiracy . . . ." (Sharpe Amend. Affidavit at ¶¶ 9-11.)

18

between the affidavit and his testimony at trial by suggesting that the calls to Trinidad were simply made on one of St. Vallier's several phones, but not the one referenced in the affidavit. (Supp. App. at 443.) Defense counsel's questioning also appears to presume that St. Vallier was the source of the actual phone number associated with the cell phone referenced in Agent Sharpe's affidavit. Nowhere in the affidavit does it state that St. Vallier provided the actual number, as opposed to simply identifying the phone based on physical appearance.[10] Given the existence of multiple phones and associated numbers, we are not convinced that the conflict between McCombs' first denial and Agent Sharpe's characterization of McCombs' statements in the affidavit establishes perjury. *See Dunnigan*, 507 U.S. at 94.

Because St. Vallier cannot show that McCombs committed perjury, his claim that the Government violated his due process rights through the knowing use of false testimony necessarily fails.

## C. Testimony by Agent Riley

St. Vallier next argues that the District Court erred by preventing him from introducing evidence to counter testimony at trial that could have suggested to the jury that funds seized from him on the day of his arrest were narcotics proceeds. For the reasons that follow, we find this claim unavailing.

---

[10] On direct examination, McCombs was questioned about the contents of the cellular phone and was permitted to answer based on his ability to physically identify it rather than based on his knowledge of the specific number associated with the phone. (*See* Supp. App. at 357.)

During trial, ICE Agent Mike Riley testified that $3,694 was recovered from St. Vallier on May 6, 2007, the day of his arrest. (Supp. App. at 475.) When asked "[d]oes ICE routinely seize – any time money is taken off of an arrestee, does ICE routinely seize that money?," Agent Riley responded, "[n]o." He then began to comment that, "[i]f we believe that the money is part of *narcotics proceeds* --" prompting an objection by defense counsel, which the District Court sustained (*id.* (emphasis added)). On cross-examination, St. Vallier attempted to introduce a settlement agreement he entered into with the Bureau of Customs and Border Protection (*id.* at 483-84), which he argues would have illustrated that the seized funds originated from legitimate sources, thereby remedying the impression potentially created by Agent Riley's earlier comment. Upon proffer, the Government objected for lack of foundation. (*Id.* at 484.) Agent Riley confirmed that he had never before seen the agreement and had no personal knowledge of it. Accordingly, the District Court sustained the objection, thereby preventing St. Vallier from questioning ICE Agent Riley regarding the settlement agreement at issue here.

The District Court did not err in making this evidentiary ruling. We review a district court's "decision to admit or exclude evidence for abuse of discretion." *United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006). The Federal Rules of Evidence forbid a witness from testifying as to a matter "unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602; *see also United States v. Villard*, 885 F.2d 117, 128 (3d Cir. 1989). Here, Agent Riley clearly lacked personal knowledge about the settlement agreement. Thus, the District Court did not abuse its discretion in sustaining the Government's objection.

20

Finally, we are unmoved by St. Vallier's contention that the comment by Agent Sharpe created irreparable damage by leaving the jury with the impression that the funds were drug proceeds. Even if Agent Riley's comment initially gave such an impression, St. Vallier was able to introduce ample testimony to the contrary. For example, McCombs noted that St. Vallier won money while gambling in Trinidad. (Supp. App. at 429.) St. Vallier's sister testified that their mother provided him with roughly $20,000 to start a business at some point prior to the trip to Trinidad. (*Id.* at 503.) Additionally, St. Vallier elicited explicit testimony from Agent Riley that Riley was unaware of the source of the seized funds and that the money could have come from legitimate sources. (*Id*. at 485.) Finally, defense counsel stressed each of these points during closing arguments, and the District Court instructed the jury not to consider as evidence answers to questions to which the Court sustained an objection. (*Id.* at 655, 699.) The existence of this countering testimony coupled with the court's instruction undermines St. Vallier's contention that Agent Riley's comment created irreparable harm.

### D. Motion for New Trial

St. Vallier next asserts that the District Court erred in denying his motion for a new trial pursuant to Federal Rule of Criminal Procedure 33,[11] which provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial

---

[11] Defense counsel initially submitted St. Vallier's motion for a new trial under Federal Rule of Criminal Procedure 29(c), which challenges a jury verdict based on the sufficiency of the evidence. FED. R. CRIM. P. 29(c). It is clear from the record before us, including the hearing on this motion, that defense counsel intended to submit the motion under Federal Rule of Criminal Procedure 33. Accordingly, we will treat the motion as filed under Rule 33.

21

if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the [g]overnment, but instead exercises its own judgment in assessing the [g]overnment's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citations omitted). A district court may "order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted." *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008) (internal quotation marks and citation omitted). "We review the denial of a motion for a new trial pursuant to Rule 33 for abuse of discretion." *Id.* at 1005 (citation omitted).

St. Vallier challenges the District Court's denial of his motion for a new trial by referencing the arguments set forth in Section II of his brief and asserting that their reconsideration by this Court in the context of a Rule 33 motion evinces the need for a new trial.[12] (St. Vallier's Br. at 23.) Potentially narrowing the scope of his argument further, St. Vallier cites only the allegedly perjurious testimony by McCombs, and insists

---

[12] Restated, these arguments include St. Vallier's claims that: (1) the District Court erred by preventing the impeachment of Ezra McCombs; (2) the Government violated his Fourteenth Amendment rights by knowingly using perjured testimony; and (3) the District Court erred by precluding the introduction of evidence showing that the funds seized from St. Vallier on the day of his arrest were procured from legitimate sources. St. Vallier's motion for a new trial was based on several grounds; however, because he limits his arguments on appeal to those raised in Section II of his brief, we decline to consider the other arguments St. Vallier presented before the District Court in support of his motion for a new trial. *See* FED. R. APP. P. 28(a)(9) (brief must include the "argument, which must contain . . . [the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies[.]").

that a new trial is required because "the blatant and unchecked perjury . . . could have affected the judgment of the jury. (*Id.* at 24.)

In light of our conclusions set forth above, we find no error in the District Court's denial of St. Vallier's Rule 33 motion. As this Court observed in *Silveus*, Rule 33 "motions are not favored and should be granted sparingly and only in exceptional cases." *Id*. (internal quotation marks and citation omitted). In denying St. Vallier's motion, the District Court described the evidence against St. Vallier as "overwhelming" and noted that "[t]his was not a case that dealt with Mr. McCombs versus Mr. St. Vallier." (*Id*. at 763.) Given the additional inculpating evidence cited by the District Court, which included testimony by law enforcement officers as well as St. Vallier's co-conspirator LaRoche, ample basis existed for the District Court to determine that a new trial was not merited. McCombs' testimony regarding St. Vallier's purported use of a phone to call Trinidad was not indispensible to his conviction, and we do not believe that even if McCombs lied, the effect would have changed the outcome of St. Vallier's trial.

Accordingly, we conclude that the District Court did not abuse its discretion by denying St. Vallier's Rule 33 motion for a new trial.

### E. Ineffective Assistance

St. Vallier additionally argues that defense counsel rendered ineffective assistance in three ways. First, he contends that his original attorney, Paul Bergrin, Esq., misguided, coerced, and threatened him in the early stages of representation, thereby inadequately preparing him for trial. Second, St. Vallier asserts that his newly appointed attorney failed to secure phone records in advance of trial that were crucial to his defense. Lastly,

23

St. Vallier argues that trial counsel failed to effectively cross-examine the Government's key witness in order to impeach him regarding statements made about the contents of the suitcases in which authorities found cocaine.

This Court generally does not entertain Sixth Amendment ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984) on a direct appeal. *See, e.g.*, *United States v. McLaughlin*, 386 F.3d 547, 556 (3d Cir. 2004); *United States v. Thorton*, 327 F.3d 268, 271 (3d Cir. 2003); *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991). Our reluctance to consider *Strickland* claims on direct review is based on the fact that "such claims frequently involve questions regarding conduct that occurred outside the purview of the district court and therefore can be resolved only after a factual development at an appropriate hearing." *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 133 (3d Cir. 1984) (internal quotations and citations omitted); *see also United States v. Theodoropoulos*, 866 F.2d 587, 598 (3d Cir. 1989) ("[T]he proper avenue for pursuing such a claim is through a collateral proceeding.").

We have, however, recognized a narrow exception to this general rule. "[W]here the record is sufficient to allow determination of ineffective assistance of counsel, an evidentiary hearing to develop the facts is not needed." *Headley*, 923 F.2d at 1083. The case before us does not fall within this narrow exception.

The record requires further development in several respects before we can properly evaluate St. Vallier's ineffective assistance claims. As an initial matter, even accepting St. Vallier's allegations against Attorney Bergrin as true, it is entirely unclear to us how his actions bear upon the presently appealed conviction given that new counsel

24

was appointed months before trial.[13]  This observation aside, the two affidavits contained in the record setting forth the allegations against Attorney Bergrin speak only to the purported consequences with respect to St. Vallier's failed appearance at a pre-trial hearing.  They offer no insight into how Bergrin's actions affected St. Vallier's preparation for trial and the resulting conviction.  Thus, this claim, if having any merit, is not ready for review.

Similarly, St. Vallier's other two arguments relating to ineffective assistance on the part of his trial counsel require further development.  On the record before us, we are unable to determine why Attorney Liebesman chose not to subpoena the phone records at issue here prior to the start of trial.  Likewise, the appellate record is inadequate for us to determine what factors led Ms. Liebesman not to impeach McCombs on statements he made about actions purportedly taken by he and the Appellant when packing the suitcases containing cocaine.  During post-trial arguments, defense counsel contended that she merely forgot; however, this is not enough for us to conduct "a comprehensive inquiry into the elements of strategy or tactics that may have entered into defense counsel's challenged decision."  *McLaughlin*, 386 F.3d at 555.

None of St. Vallier's *Strickland* claims fit within the narrow class amenable to review on direct appeal.  St. Vallier's ineffective assistance of counsel claims are thus premature.  Accordingly, we will deny these claims without prejudice to his right to raise them on collateral attack.  *See Thorton*, 327 F.3d at 272.

---

[13]  According to the Docket Sheet provided in the record on appeal, Attorney Ruth M. Liebesman replaced Attorney Bergrin as defense counsel on January 7, 2009.  Trial commenced on April 20, 2009, almost four months later.

25

## D. Sentencing

Lastly, St. Vallier challenges the sentence imposed by the District Court, arguing that it is both procedurally and substantively unreasonable. Because we conclude that the District Court committed a procedural error, we need not address St. Vallier's latter argument.

On August 3, 2009, the District Court sentenced St. Vallier to 204 months of incarceration. Prior to and during the sentencing proceeding, St. Vallier objected to the guidelines calculation of his criminal history category provided by the Probation Office in his PSR. Specifically, St. Vallier claimed that the PSR contained an error indicating that he served the entirety of a 364 day sentence pursuant to an earlier conviction when, according to him, the sentence was actually suspended. Consideration of this prior sentence resulted in the addition of three points to St. Vallier's criminal history category.[14] The District Court overruled St. Vallier's objections, and when calculating St. Vallier's sentence for the current offenses, took the prior sentence into account as represented in the PSR.

Following sentencing, the Government confirmed that St. Vallier's 364 day sentence was in fact suspended. On appeal, the Government concedes that the District Court relied on inaccurate information contained in the PSR and urges this Court to

---

[14] Two criminal history points were assessed based on the Probation Office's belief that the earlier conviction resulted in a prior sentence of more than sixty days but less than thirteen months, pursuant to U.S.S.G. § 4A1.1(b). An additional criminal history point was assessed pursuant to U.S.S.G. § 4A1.1(d) based on the Probation Office's belief that St. Vallier had served 364 days of incarceration and committed the instant offense within two years of his release.

26

vacate the sentence and remand for resentencing using an accurate criminal history category and appropriate guidelines range. (Government's Br. at 39.)

"If the district court commits procedural error, our preferred course is to remand the case for re-sentencing, without going any further." *United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010) (citing *United States v. Ausburn*, 502 F.3d 313, 328 (3d Cir. 2007)). Here, the District Court clearly committed a procedural error by relying on the erroneous information contained in St. Vallier's PSR.

Accordingly, we will vacate St. Vallier's 204 month sentence and remand this matter for resentencing in light of the correct information now available.

## III.

For the foregoing reasons, we will affirm the District Court's judgment of conviction. Due to the procedural error discussed above, we will vacate St. Vallier's sentence and remand for resentencing before the District Court.